Argued and submitted September 12, reversed and remanded with instructions October 9, 1996, petition for review denied February 4, 1997 (324 Or 560)

# DEPARTMENT OF LAND CONSERVATION AND DEVELOPMENT,
*Respondent,*

*v.*

# LINCOLN COUNTY,
Pacific H.W. Investments, Inc.,
and James L. Watson,
*Petitioners.*

## (LUBA No. 95-166; CA A93565)

925 P2d 135

Wayne Belmont, Lincoln County Counsel, argued the cause and filed the brief for petitioner Lincoln County.

Daniel Kearns argued the cause for petitioners Pacific H.W. Investments, Inc., and James L. Watson. With him on the brief was Preston Gates & Ellis.

John T. Bagg, Assistant Attorney General, argued the cause for respondent. With him on the briefs were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Anne Corcoran Briggs, Assistant County Counsel, filed the brief for *amicus curiae* Columbia County.

Before Deits, Presiding Judge, and De Muniz and Haselton, Judges.

DEITS, P. J.

## DEITS, P. J.

Petitioners Watson and Pacific H.W. Investments, Inc. (petitioners) applied for, and, in July 1995, the Lincoln County governing body approved, a 113-lot planned unit development on a 50-acre site in a rural residential zone. The Department of Land Conservation and Development (DLCD) appealed the decision to LUBA, contending that the approval violated an amendment to Goal 11 that became effective in December 1994. LUBA agreed and reversed the county's decision. Petitioners and the county seek our review. We reverse.

Goal 11 relates to public facilities and services and requires generally that planning jurisdictions "plan and develop a timely, orderly and efficient arrangement of public facilities and services to serve as a framework for urban and rural development." The 1994 amendment, among other things, added the following paragraph and definition to the goal:

> "For land that is outside urban growth boundaries and unincorporated community boundaries, county land use regulations shall not rely upon the establishment or extension of a water system to authorize a higher residential density than would be authorized without a water system.
>
> "* * * * *
>
> "*Water system*—means a [system] for the provision of piped water for human consumption subject to regulation under ORS 448.119 to 448.285."[1]

In adopting the amendment, the Land Conservation and Development Commission (LCDC) exercised its authority under ORS 197.245, by issuing a statement of compelling reasons for making the amendment applicable immediately to local land use legislation and land use decisions, rather than after the one-year grace period that that statute prescribes in the absence of such compelling reasons.

At all material times, petitioners' property is and has been located in the territory and service area of the Seal

---

[1] It is apparently undisputed that the property in question is not located within either an urban growth boundary or an unincorporated community boundary.

Rock Water District, a body that meets the goal's definition of a "water system." Under section 1.1310(3)(a) of the county zoning ordinance, the density provisions that apply in the zone are:

"(A)   The minimum lot area shall be 6,000 square feet for a single family dwelling unit and 10,000 square feet for a duplex when a lot is served both by a public or community water supply system and public or community sewage disposal system.

"(B)   The minimum lot area shall be 15,000 square feet per dwelling unit when a lot is served by either a public or community water source, or public or community sewage disposal.

"(C)   The minimum lot area per dwelling unit shall be 2 acres when a lot is not served by either a public or community sewage disposal or water supply system."

Because the property is located in and can be served by the existing water district, the county concluded that the greater densities under the ordinance, which the proposed development requires, are permissible.

DLCD argued to LUBA and argues here that the county's decision violates the 1994 amendment, by approving the development and by applying a regulation that allows a higher residential density on the basis of "the establishment or extension of a water system." Petitioners and the county argue that LUBA erred in concluding that the decision violates the goal amendment as a matter of substance. They also argue that the amendment does not apply to the land use decision in question.[2] We turn to that issue first.

■     The argument that the amendment does not apply here takes two forms: First, that the amendment is inapplicable to *the county* until the time of its next periodic review; and second, that under *Foland v. Jackson County*, 311 Or 167, 807 P2d 801 (1991), and like authorities, the statewide planning goals are generally inapplicable to particular *land use decisions* by localities with acknowledged land use legislation. Although petitioners and the county agree that there

---

[2] The county's and petitioners' contentions on this point differ somewhat. It is unnecessary to our discussion to elaborate on the differences.

are certain statutory exceptions to the second principle, they contend that the present decision does not come within any of those exceptions.

LUBA rejected those contentions and held that the amendment to Goal 11 was applicable here. It relied principally on ORS 197.646(1) and (3), which provide, in relevant part:

> "(1) A local government shall amend the comprehensive plan and land use regulations to implement new or amended statewide planning goals, commission administrative rules and land use statutes when such goals, rules or statutes become applicable to the jurisdiction. Any amendment to incorporate a goal, rule or statute change shall be submitted to the department as set forth in ORS 197.160 to 197.625.

> "* * * * *

> "(3) When a local government does not adopt comprehensive plan or land use regulation amendments as required by subsection (1) of this section, the new or amended goal, rule or statute *shall be directly applicable to the local government's land use decisions.*" (Emphasis supplied.)

LUBA reasoned that, when LCDC adopts a statement of compelling reasons under ORS 197.245 making a goal amendment immediately applicable, the amendment *ipso facto* becomes applicable to local planning jurisdictions pursuant to ORS 197.646(1) at the time that its promulgation and filing are complete. LUBA concluded further that, by the express terms of ORS 197.646(3), statewide goal amendments are directly applicable to the land use decisions of cities and counties until they adopt the required implementing legislation.[3] In sum, LUBA held that the 1994 amendment to Goal 11 was in effect and was directly applicable to the county's decision. We agree with LUBA's reasoning and its conclusions on that issue.

---

[3] The county had not adopted implementing legislation before it made the present decision. LUBA also rejected petitioners' contention that the amendment did not become applicable until 1998. It concluded, correctly, that the rule on which petitioners relied for that contention applies only to "unincorporated communities," which the area in question is not.

■        LUBA next turned to the question of the effect of the amendment, and concluded that the county's decision was in conflict with it. The resolution of this question turns on the meaning of the terms "establishment" and "extension" as used in the amendment. LUBA held that the term "establishment" is essentially synonymous with "in existence" or "available," rather than referring only to water systems that are to be created prospectively or contemporaneously with the higher densities with which the amendment is concerned. LUBA then concluded that, because the proposed development is to be served by the existing water district and its density is permitted under the ordinance only because it will be served by that water system, the county's decision allowing the development violated the amended goal.

In their arguments to us, DLCD agrees with LUBA's holding that "establishment" includes already existing water systems, while petitioners and the county assert that "establishment" refers only to the creation of new systems. The parties also disagree about the meaning of "extension." DLCD contends that, as used in the amendment, the term "extension" includes connections to individual lots within the existing service area, such as those that are planned here. The county and petitioners argue that the word refers only to physical expansions of the service areas or major facilities of existing systems.[4] We agree with petitioners and the county on both points.

■■        In determining the meaning of these words, we first look to the text and context of the goal to surmise the agency's intent in adopting this language. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993). The terms at issue here are not defined in the statutes or goals and,

---

[4] In this case, we accord no formal "deference" to the interpretation of the amendment that DLCD advocates. Although DLCD plays a role in the land use rulemaking scheme, the goals and other substantive rules are promulgated by LCDC. More fundamentally, DLCD is a *party* in the proceeding. Its role here is neither that of an adjudicator nor of a policymaker.

As with the issue of the amendment's applicability, *see* note 2, the arguments of petitioners and the county on this issue also differ in their particulars, but both fall within our description. Moreover, we will not base our holding in this opinion on any broader description that the arguments may imply.

therefore, we look to their plain, natural and ordinary meaning. The parties provide us with competing dictionary definitions of both words. Although selected definitions can be found to support the respective views that we have described, we find the county's and petitioners' understanding of the two words to be more plausible. We conclude that the term "establishment" in this context is likelier to refer to the act of creating than to a consummated creation; the word *can* be *defined* in either way but, had the latter meaning been intended in the amendment, the words "existence," "availability," "presence," "useability" or "proximity," *inter alia*, would have been far better word choices to convey that meaning.

Similarly, the word "extension" *can* be read in the respective ways that the parties espouse, but the more plausible meaning here, in our view, entails a greater expansion than new hookups within an existing service area. Again, many words with more minimalist connotations could have been found, had simple attachments to a proximate water supply been what the drafters wished to describe. Moreover, when the terms "establishment" and "extension" are considered together, the likelier intended parallel was (1) the creation of a new system in an area and (2) the expansion of an existing one into a previously unserved area, rather than (1) the existence of an old system and (2) its connection to serveable locations in its present area.

Nevertheless, we cannot say that the text of the amendment provides a definitive answer as to the intended meaning. We also find no conclusive answer in the context. Accordingly, we turn to the administrative history of the amendment. *See PGE*, 317 Or at 611-12. The most revealing item is the following passage from the October 18, 1994, memorandum from DLCD Director Benner to LCDC:

"Goal 11 requires 'urban' facilities and services for urban areas, and 'rural' facilities and services for rural areas (urban areas are inside UGB's, and rural areas are outside UGB's). Therefore, under the reasoning in [*1000 Friends of Oregon v. LCDC (Curry Co.)*, 301 Or 447, 724 P2d 268 (1986)], authorizing urban facilities in rural areas could require an exception to Goal 11. The draft rules propose to

authorize and encourage urban facilities in communities without exceptions to Goal 11 and 14.

"* * * * *

"Comments on the previous proposals indicated widespread concern about exception requirements for new water system extensions. Testimony supported the proposed prohibition on sewer systems outside UGB's and communities. With regard to water, the concern is that many water systems already exist outside communities and UGB's, and most of these need to expand in order to meet new federal drinking water standards. Currently, such expansions may be under the cloud of the Curry County ruling, but apparently that is preferred to an outright requirement for an exception.

"In response, the department has abandoned wording which would try to define water systems as either 'rural' or 'urban.' Instead, we have attempted to address our chief concern arising from the Curry County case: plans which provide for increases in rural density (outside UGB's and outside unincorporated communities) based on the provision of *new or extended community water systems*. Many counties have zoned residential areas for rural densities (e.g., one unit per five acres) but allow a density increase to potentially urban levels (e.g., one unit per half acre) when a community water system is provided.

"The department would not limit water systems in order to regulate rural uses. Rather, we propose to limit zoning so that density remains rural. To do this, *the proposed Goal 11 amendment would allow all water systems and water extensions*, but would prohibit county zoning which authorizes a higher density than could be authorized without the water system.

"More specifically, the department proposes amendments to Goal 11 which: (1) authorize sewer and water systems inside all unincorporated community boundaries; (2) provide for *planning* with regard to these services; and (3) clarify the definition and policy regarding new community sewer and water facilities outside urban growth boundaries and unincorporated community boundaries, i.e., prohibit sewer systems outside UGB's and communities, and prohibit zoning that provides for a density increase due to water provision." (Last emphasis in original; other emphasis supplied.)

As we read the history, it supports the conclusion that the text and context suggest. The director's memorandum refers to "new or extended" systems, and also refers to the allowance of systems and extensions. We understand the word "allow" in the context of the memorandum to mean "prospectively permit." The word as so used could only apply to new systems or new extensions. We conclude that the word "establishment" in the amendment refers to the creation of new water systems. Although the administrative history is not as specifically dispositive as to the meaning of the word "extension," in isolation, the history points to a reading of the entire phrase "establishment or extension" that is systematic in scope, and that contemplates the new *or* expanded presence of water systems in areas where none was present before. The corollary is that the amendment does not proscribe local legislation or decisions, like this one, that base higher densities on existing water systems or new connections to such systems within their existing service areas.

Because the density of the proposed development does not result from the "establishment or extension of a water system" as we interpret that phrase, LUBA erred in concluding that the county's decision violates the 1994 amendment to Goal 11.

Reversed and remanded with instructions to affirm county's decision.