Argued and submitted January 25, reversed and remanded with instructions
February 24, 1999

# DEPARTMENT OF TRANSPORTATION,
*Respondent,*

*v.*

# COOS COUNTY,
*Respondent below,*

*and*

# MENASHA DEVELOPMENT CORPORATION,
*Petitioner.*

(LUBA Nos. 98-038, 98-039; CA A104203)

976 P2d 68

Steve C. Morasch argued the cause for petitioner. With him on the brief was Schwabe, Williamson & Wyatt.

John T. Bagg, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Landau, Presiding Judge, and Deits, Chief Judge, and Rossman, Senior Judge.

DEITS, C. J.

## DEITS, C. J.

Petitioner[1] Menasha Development Corporation seeks review of LUBA's remand of Coos County's comprehensive plan and zoning amendment that redesignated petitioner's 125-acre tract from exclusive farm use to rural residential. Respondent Oregon Department of Transportation (ODOT) appealed the county's amendment to LUBA. LUBA agreed with ODOT's argument that the amendment violated OAR 660-012-0060(2)(d), a provision of the Land Conservation and Development Commission's (LCDC) rules implementing Statewide Planning Goal 12. Petitioner contends that LUBA erred in so concluding. We agree and reverse.

We quote the facts that are pertinent to our discussion from LUBA's opinion:

"The subject property is a 125-acre parcel located approximately six miles north of the North Bend/Coos Bay area, approximately one-half mile east of Highway 101, and one and one-quarter miles from the Pacific Ocean. The property borders the unincorporated community of Hauser. Access to and from the property is via local roads onto Highway 101, which is a facility designated as a highway of statewide importance.

"* * * * *

"In August 1996, [petitioner] applied to the county for a comprehensive plan amendment to redesignate the property from Agricultural to Rural Residential, and a [corresponding] zone change * * *. The requested amendments are intended to allow up to 25 rural residential homesites on five-acre lots, after future subdivision approval. The county * * * approved intervenor's application on January 21, 1998.

"* * * * *

"ODOT explains that Highway 101 is designated in the Oregon Highway Plan (OHP) as a highway of statewide importance, and that a statewide highway in a rural area, including any intersections, should function at a level of service (LOS) of 'C.'[7] ODOT argues that the traffic study submitted by the [petitioner] in the present case shows that

---

[1] We refer to the parties as they are designated in this court.

the proposed rural subdivision will affect three intersections with Highway 101, each of which is presently operating at a LOS of 'E,' well below the minimum acceptable LOS identified in the OHP. According to ODOT, the traffic study shows that the proposed rural subdivision will add enough additional traffic to Highway 101 that the 'reserve capacity' of the Highway 101/Wildwood Drive intersection will be reduced by 29 percent, from 28 vehicles per peak hour to 20 vehicles per peak hour.

---

"7  ODOT explains that:

" ' "Level of Service" is a term used to describe the quality of traffic flow. Levels of service A to C are considered good; Urban streets and signalized intersections are typically designed for level of service D. Level of service E is considered to be the limits of acceptable delay. F is considered unacceptable by most drivers.'

"Further, at oral argument the parties explained that there is an essential correlation between the reserve capacity of a facility and its level of service. Facilities such as the affected intersections on Highway 101 with an identified LOS of 'C' have a reserve capacity of 200 to 299 vehicles during peak hours. The same facilities at LOS 'D' have a reserve capacity of 100 to 199 vehicles, while facilities at LOS 'E' [have] a reserve capacity of 0-99 vehicles."

OAR 660-012-0060(1) requires that, if an amendment to a comprehensive plan or land use regulation "significantly affects a transportation facility," like the highway here, *see* OAR 660-012-0005(23), one of three defined "mitigation" measures must be taken in conjunction with the amendment. OAR 660-012-0060(2) describes four circumstances under which a "plan or land use regulation amendment significantly affects a transportation facility[.]" The only such circumstance that is at issue here is the one described in subsection (2)(d) of the rule, which provides that an amendment significantly affects a facility if it

"[w]ould reduce the level of service of the facility below the minimum acceptable level identified in the [Transportation System Plan (TSP)]."2

---

2 Because the county has not adopted an applicable TSP, the minimum acceptable level of service here is C, pursuant to the state plan.

Petitioner argues, and the county agreed, that there is no significant effect within the meaning of that provision, because the level of service was already at E, two levels below the minimum acceptable level before the amendment was adopted. As petitioner reads OAR 660-012-0060(2)(d), an amendment must cause a reduction in the service level that brings it below the minimum acceptable level in order to give rise to a significant effect under subsection (2)(d). Conversely, ODOT argues, and LUBA agreed, that a significant effect also occurs under the subsection if, as happened here, the level of service was below the minimum before the amendment, and the amendment has the effect of further reducing the facility's service capacity, albeit not the service level itself. In essence, petitioner reads the critical phrase in the subsection to mean "reduce the level of service * * * [to one] below," while ODOT understands the phrase to read "reduce the level of service * * * [that is] below."

Both sides attempt to argue text and context to support their positions and point to unacceptable effects of the other's interpretation of the rule. ODOT argues that petitioner's interpretation "permits unlimited reductions in capacity and LOS simply because the transportation facility was already below the minimum acceptable LOS." Petitioner, on the other hand, asserts that ODOT's argument and LUBA's interpretation would prevent any amendment that affects a facility's capacity by as little as a single car daily, if the facility's service level was already below the acceptable minimum for reasons unrelated to the amendment.

It is unnecessary for us to resolve the full scope of the interpretive question that the parties pose in order to decide this case. The parties appear to agree that "level of service," although not defined in the rule, is a "term of art," and that it refers to six discrete incremental stages that are identified in descending order of sufficiency by letters of the alphabet. In order for there to be a "significant effect" under OAR 660-012-0060(2)(d), whatever else an amendment may or may not have to do, it must "reduce the level of service." The amendment here does not do that. The level of service was at E before the enactment of the amendment, and it will remain within the E range after the amendment.

We disagree with ODOT and LUBA that an amendment that leaves the level of service unchanged—albeit below the minimum acceptable level—can give rise to a significant effect within the meaning of the rule. ODOT's more general concern, of course, is that the rule as petitioner and the county interpret it would permit an amendment, for example, that would drop a service level all the way from B to F, if the minimum acceptable level for the facility was A and the existing level was B at the time of the amendment. Because this case does not require us to decide whether ODOT's concern is well-founded, ODOT might better address it to LCDC.

Reversed and remanded with instructions to affirm county's decision.