Argued and submitted July 6, affirmed October 3, 2001

DEPARTMENT OF TRANSPORTATION,
*Respondent,*

*v.*

CITY OF KLAMATH FALLS,
*Respondent below,*

*and*

SOUTHVIEW PROPERTIES
DEVELOPMENT, LLC,
*Petitioner.*

2000-147; A114322

34 P3d 667

D. Daniel Chandler argued the cause for petitioner. With him on the brief were Sarah E. Kamman and Schwabe, Williamson & Wyatt, P.C.

Jas. Jeffrey Adams, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Haselton, Presiding Judge, and Deits, Chief Judge, and Linder, Judge.

DEITS, C. J.

2-b

## DEITS, C. J.

Petitioner, Southview Properties Development, LLC (Southview), seeks review of a final opinion and order of the Land Use Board of Appeals (LUBA) remanding to the City of Klamath Falls its approval of an amendment to the "Southview" planned unit development (PUD). *ODOT v. City of Klamath Falls*, 39 Or LUBA 641 (2001). We affirm.

We take the facts from LUBA's order. The city approved the Southview PUD in 1979. It consisted of approximately 560 acres located in the southwest quadrant of the city. An additional 40 acres nearby were zoned for single-family residential use at the same time that the PUD was approved, but this property was not part of the PUD. Both properties were brought within the Klamath Falls urban growth boundary at that time. Highway 140 borders part of the PUD on the west. The 1979 PUD proposed access to the highway at the intersection of Orindale Road. Highway 140 continues southeast of that intersection and connects with Highway 66, which runs east and west. The combined Highway 140/66 continues a short distance to the east and connects with Highway 97. Highway 97 runs northeast into the city and south to California.

In 1981, Klamath Falls adopted its comprehensive plan. The plan included the Southview PUD. In 1995, the city rewrote the Community Development Ordinance but preserved approval of the Southview PUD. In 1998, the city adopted its transportation system plan (TSP) pursuant to OAR chapter 660, division 12, a Land Conservation and Development Commission (LCDC) rule compilation known as the Transportation Planning Rule (TPR). The city's TSP assumes little or no population growth in the southwest quadrant of the city and does not plan for transportation facilities that might be made necessary by the Southview PUD.[1]

---

[1] OAR 660-012-0005(32) defines "transportation system plan" to mean

"a plan for one or more transportation facilities that are planned, developed, operated and maintained in a coordinated manner to supply continuity of movement between modes, and within and between geographic and jurisdictional areas."

In 1999, Southview sought a plan amendment adding the nearby 40 acres of single-family residential property to the PUD. The proposed amendment would substantially change the uses and traffic patterns within the PUD. It would eliminate some of the eastern road connections proposed in the 1979 version of the PUD, but it would retain a connection to Lindley Way. Lindley Way presently is a dead-end local street to the east of the Southview PUD. Both the original and the amended PUD envision an eventual connection to Lindley Way. The city approved the proposed plan amendment, and the Oregon Department of Transportation (ODOT) appealed the approval to LUBA.

■     At the outset, it is important to identify the administrative rules and planning documents that are pertinent to this decision. OAR 660-012-0060 provides, in part:

"(1)   Amendments to functional plans, acknowledged comprehensive plans, and land use regulations which significantly affect a transportation facility shall assure that allowed land uses are consistent with the identified function, capacity, and performance standards (e.g. level of service, volume to capacity ratio, etc.) of the facility. This shall be accomplished by either:

"(a)   Limiting allowed land uses to be consistent with the planned function, capacity, and performance standards of the transportation facility;

"(b)   Amending the TSP to provide transportation facilities adequate to support the proposed land uses consistent with the requirements of this division;

"(c)   Altering land use designations, densities, or design requirements to reduce demand for automobile travel and meet travel needs through other modes; or

"(d)   Amending the TSP to modify the planned function, capacity and performance standards, as needed, to accept greater motor vehicle congestion to promote mixed use, pedestrian friendly development where multimodal travel choices are provided.

"(2)   A plan or land use regulation amendment significantly affects a transportation facility if it:

"(a)   Changes the functional classification of an existing or planned transportation facility;

> "(b) Changes standards implementing a functional classification system;
>
> "(c) Allows types or levels of land uses which would result in levels of travel or access which are inconsistent with the functional classification of a transportation facility; or
>
> "(d) Would reduce the performance standards of the facility below the minimum acceptable level identified in the TSP."

When state highways are involved, as in this case, the applicable TSP is the Oregon Highway Plan (OHP). The OHP that applies here was adopted by the Oregon Transportation Commission in March 1999. Consequently, the "performance standards," which are referred to in the above rules, are taken from the OHP. As relevant to this case, the OHP uses a "volume to capacity" (V/C) ratio as the basic measure of highway performance. This "V/C" ratio is the ratio of traffic volume on a given highway to the capacity of that highway. According to the OHP, the V/C ratio is "the peak hour traffic volume (vehicles/hour) on a highway section divided by the maximum volume that the highway section can handle." *Oregon Highway Plan*, 72 (1999). This measurement in the OHP replaced an earlier classification system that included six fixed performance categories of "levels of service" which were given letter designations, "A" through "F." V/C ratios are set out in tables in the OHP. For those highways that are currently operating in violation of acceptable V/C ratios set in the tables, the applicable performance standard seeks to avoid further degradation of performance where no performance improvements are feasible.[2] *Id.* at 74, 79. Additionally, if an amendment to a TSP, an acknowledged comprehensive plan, or a land use regulation "increases the volume to capacity ratio further, it will significantly affect the facility."[3] *Id.* at 79.

---

[2] Southview questions whether this provision of the OHP is consistent with LCDC's rule and whether it is within the authority of the Oregon Transportation Commission. As we will discuss later in the opinion, it is unnecessary to address that issue at this time.

[3] Although the "significantly affect" language in the OHP is the same as that used in OAR 660-012-0060(2), our decision, as well as LUBA's, is based on the LCDC rule, OAR 660-012-0060(2), which, in part, sets out the circumstances that

In its decision in this case, LUBA indicated that the parties disputed the precise traffic estimates. LUBA also indicated that it appeared from the evidence in the record that the revised PUD would generate 1,690 average daily trips over the 1979 version of the development. LUBA held that the improvements were not identified in the TSP and, therefore, the city could not rely on what LUBA termed "entirely speculative" improvements to support the conclusion that the amended PUD would not significantly affect a transportation facility. LUBA then remanded the decision to the city for consideration of improvements actually included in the TSP to determine whether those improvements would support the conclusion that the amended PUD would not "significantly affect" a transportation facility. LUBA further explained that, if, on remand, the city decides that the amendment does significantly affect a facility, the city must apply one or more of the strategies in OAR 660-012-0060(1).

LUBA indicated that the applicable performance standard, the V/C ratio, for the roadways in question was ".75";[4] that is, the facility is within the standard if the volume of traffic at peak hour is not higher than .75 of the maximum volume. LUBA went on to explain that, if, during the relevant planning period,[5] the proposed amendment would cause the certain intersections to exceed the applicable V/C ratio stated in the OHP sooner than they otherwise would, this effect would fall within the "significantly affects" language of OAR 660-012-0060(2). LUBA said:

> "In the present case, the affected facilities are currently in compliance with the V/C standard, but are projected to violate the V/C standard sometime during the relevant planning period, as a result of a combination of impacts from the

significantly affect a transportation facility. Specifically, OAR 660-012-0060(2)(d) provides that, if the plan or land use regulation amendment would reduce the "performance standards of the facility below the minimum acceptable level identified in the TSP," the amendment, by definition, "significantly affects a transportation facility." Accordingly, it is unnecessary to address Southview's argument that the Oregon Transportation Commission has redefined the meaning of the term "significantly affects" as used in the LCDC rule.

[4] We note the Traffic Impact Analysis (TIA) of April 2000, prepared for the proposed PUD by Kittelson & Associates, Inc., shows the V/C ratios for the intersections in question to vary from .75 to .80. The parties do not discuss this variance, and we therefore do not understand it to affect the parties' arguments or LUBA's determination.

[5] The relevant planning period in this case is 20 years. OAR 660-012-0005(17).

proposed amendment and increases in background traffic. In other words, the proposed amendment will cause these facilities to violate the V/C standard sooner than they otherwise might. If the proposed amendment will cause the facility to violate the V/C standard in [the] year 2010, for example, the causation element in OAR 660-012-0060(2)(d) is present, notwithstanding that the facility would fail anyway in the year 2020 due to increased background traffic." *City of Klamath Falls*, 39 Or LUBA at 657.

On review to us, Southview's first assignment of error is that "LUBA erroneously interpreted and applied [OAR] 660-012-0060(2)([d]) of the Transportation Planning Rule in deciding that an amendment to a land use regulation significantly affects a transportation facility where the facility will fail anyway with[in] the relevant planning period." In contending that LUBA erred in its interpretation of OAR 660-012-0060(1) and (2), Southview makes a number of subarguments.

■■ Southview first argues that LUBA erred in its interpretation of OAR 660-012-0060(2)(d), specifically that LUBA erred in its reading of the language of the rule that provides that a plan amendment significantly affects a transportation facility if it "[w]ould reduce the performance standards of the facility below the minimum acceptable level identified in the TSP." There are two premises to Southview's argument on this point. Southview's first premise is that, whether the amendment "significantly affects" a transportation facility is measured at the *end* of the planning period, in this case, a 20-year period. OAR 660-012-0005(17). Specifically, it contends that, because the intersections could fail at any time during the 20-year planning period, "it is impossible to conclude that the proposed amendment, which adds approximately 225 p.m. peak hour trips to the surrounding transportation facilities, will cause the facilities to fail sooner than they otherwise would."[6] Southview's second premise is that the effects of the amendment must be the sole cause of the reduction in performance in order for them to "significantly

---

[6] We understand Southview's figure to refer to analysis of peak afternoon traffic appearing in the TIA prepared by Kittelson & Associates, Inc.

affect" a transportation facility. In other words, the only decision during the planning period that can be said to "significantly affect" the transportation facility is the one that takes the V/C ratio over the maximum acceptable level. Southview relies on our decision in *Dept. of Transportation v. Coos County*, 158 Or App 568, 976 P2d 68 (1999), for both premises.

We conclude that Southview's arguments are not supported by the text and context of the rules. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 612 n 4, 859 P2d 1143 (1993). There is simply nothing in the text and context of the rules that can be read to require that the effects of a proposed action may be measured only at the end of a planning period. If that were the case, the provisions of OAR 660-012-0060(1), providing alternative means of ensuring that amendments that significantly affect a facility are consistent with applicable performance standards, would be meaningless. Further, Southview does not cite anything in OAR chapter 660, division 12, the OHP, or any other authority suggesting that OAR 660-012-0060(1) and (2) apply only if the amendment is the sole cause of an immediate increase in the applicable V/C ratio to a point in excess of the proscribed acceptable level. Southview's position would require us to read substantive provisions into LCDC's rule that are not there. As did LUBA, we decline to do so.

We also do not agree with Southview's contention that its argument is supported by our holding in *Coos County*. The circumstances in *Coos County* were different. Most significantly, at the time of our decision in that case, the applicable provisions of the OHP used a "level of service" designation as the applicable performance standard. As mentioned earlier, six levels of service, "A" through "F," were identified. In the *Coos County* case, the facility at issue was already below the minimum acceptable level of service. We held that additional traffic added to the facility, which was already below the acceptable level, did not significantly affect the facility within the meaning of OAR 660-012-0060(2)(d), because it did not reduce the level of service designation.

After our decision in that case, LCDC amended OAR 660-012-0060(2)(d). As noted earlier, the current version of

OAR 660-012-0060(2)(d) provides that the trigger for a finding of "significantly affects" is a determination that the amendment "[w]ould reduce the performance standards of the facility below the minimum acceptable level identified in the TSP." As discussed above, the amended version of the OHP no longer uses the level of service category as the applicable performance standard but, instead, uses a V/C ratio. This change means that a finding that an amendment significantly affects a transportation facility no longer depends on a drop in the level of service from one category to another.

■ As LUBA noted, with the one possible but unresolved exception of Highway 140/66, the affected intersections are currently in compliance with the V/C standard but are projected to violate the standard at some time during the relevant planning period. *City of Klamath Falls*, 39 Or LUBA at 657 & n 15. We conclude, as did LUBA, that, if the proposed amendment will cause the V/C ratio to be violated sooner than it otherwise would be during the planning period, it will significantly affect the facility within the meaning of OAR 660-012-0060(2)(d). It makes no sense to hold that, if it is projected that the V/C ratio will be violated at the end of the planning period, all of the amendments to plans that occur during the planning period do not need to be considered and are not subject to the provisions of OAR 660-012-0060(1) and (2).

■ Also, as part of its first assignment of error, Southview asserts that, if a traffic study shows that a transportation facility will fail, the applicable TSP must have been based on predictions that were not correct. Consequently, it is Southview's position that the appropriate remedy is not to undertake one of the alternative courses of action identified in OAR 660-012-0060(1) but, rather, to wait to address the issue at periodic review. Periodic review, according to Southview, is particularly designed to address substantial changes in circumstances, including assumptions, upon which a comprehensive plan or land use regulation is based. *See* ORS 197.628(3)(a). Southview's argument, however, is not supported by the pertinent statutes or rules. This PUD amendment does not constitute the "substantial change in circumstances" needed to invoke periodic review. ORS 197.628(3)(a). LCDC approves the schedule for periodic

review pursuant to OAR 660-025-0030. Additionally, pursuant to OAR 660-025-0050, the Department of Land Conservation and Development commences "the periodic review process by sending a letter to the affected local government pursuant to the schedules." Periodic review is not intended to be a substitute for consideration of individual land use decisions for conformity with applicable rules and statutes.

■ In a related argument, Southview identifies this case as one presenting a "fundamental policy choice regarding what happens when a traffic study shows that an intersection may cross level of service standards sometime during the next 15 or 20 years, even if all land use map and plan amendments are frozen." Southview appears to believe that LUBA made the wrong choice and that the import of that choice is the imposition of a moratorium on any amendment that may add a trip to an ODOT facility and thereby adversely affect the facility's performance. We disagree.

OAR 660-012-0060(1) sets out measures that may be taken when an amendment significantly affects a transportation facility. In sum, and as relevant here, the measures call for limiting the land use, amending the TSP or improving the affected transportation facility. The list of four alternatives in OAR 660-012-0060(1)(a) through (d) may not be the alternatives that Southview prefers, but they are the applicable measures that must be applied. They do not freeze development. Denial of a request because it violates an applicable land use rule does not create a moratorium.

■ Southview contends that LUBA's decision creates a *de facto* moratorium. That contention, however, ignores an Oregon statute that addresses the specific circumstances present in this case. Southview cites ORS 197.524 as requiring either (1) a formal public facilities strategy under ORS 197.768 or (2) a formal declaration of a moratorium under ORS 197.505 to ORS 197.540 when a local government engages in a pattern or practice of delaying or stopping the issuance of permits or approvals based on a shortage of public facilities. However, Southview fails to note that ORS 197.524(2) provides that the requirement of adopting a public facilities strategy or a moratorium does not apply "to the delay or stopping of the issuance of permits, authorizations or

approvals because they are inconsistent with the local government's comprehensive plan or land use regulations." LUBA's remand of the city's decision because it may be inconsistent with the TPR is not a moratorium; it is the reversal of an approval because the approval may be inconsistent with an applicable law. *See Gisler v. Deschutes County*, 149 Or App 528, 537, 945 P2d 1051 (1997) (citing ORS 197.505(1) (1995), which included a similar exception to the moratorium definition).

■        In its final argument under its first assignment of error, Southview asserts that LUBA erred in concluding that the PUD amendment may significantly affect the Highway 140/66 intersection. Southview argues that this intersection is now in violation of the maximum acceptable ratio, and, therefore,

> "the intersection of Highways 140 and 66 is currently operating below the minimum acceptable level identified in the TSP. The amendment at issue in this case cannot, therefore, reduce the performance standard of the facility below the minimum acceptable level. *Coos County*, 158 Or at 572-573."

As a result, according to Southview, as a matter of law the PUD amendment cannot significantly affect the intersection within the meaning of OAR 660-012-0060(2)(d).

LUBA, however, did not reach the question of whether this intersection currently violates the applicable V/C ratio. LUBA remanded the Highway 140/66 issue to the City of Klamath Falls to determine whether the intersection currently violates the applicable V/C ratio. As discussed above, LUBA explained that it was necessary to remand the case, because the city did not consider improvements anticipated in the TSP that might have an effect on whether the intersection violates the ratio. Until the city undertakes that evaluation, it is premature to evaluate whether the proposed amendment significantly affects that intersection. Southview's other subarguments under this assignment of error are affirmed without discussion.

In the second assignment of error, Southview argues that LUBA erred in determining that the "no further degradation" standard in the OHP is an acceptable performance

standard under OAR 660-012-0060(2)(d). We do not reach this argument because LUBA did not so hold in this case. LUBA noted that the Highway 140/66 intersection *may* exceed the applicable V/C ratio, but, as discussed above, LUBA did not resolve the matter. Consequently, LUBA did not adjudicate the matter of the "no further degradation" standard in this case, because it was unnecessary to do so. It would be inappropriate for us to do so at this time. Whether or not the "no further degradation" standard becomes applicable in this case will depend on the city's decision on remand.

Affirmed.