Argued and submitted February 6, reversed and remanded with instructions
April 30, petition for review denied September 23, 1997 (326 Or 57)

STATE OF OREGON ex rel
JACKSON CREEK SAND COMPANY,
an Oregon corporation,
*Respondent,*

*v.*

JACKSON COUNTY,
*Appellant.*

(95-2853-E-2; CA A93329)

938 P2d 773

Arminda J. Brown argued the cause for appellant. With her on the briefs was Jackson County Counsel.

Daniel O'Connor argued the cause for respondent. With him on the brief was Huycke & O'Connor.

Theodore R. Kulongoski, Attorney General, Virginia L. Linder, Solicitor General, and John T. Bagg, Assistant Attorney General, filed a brief *amicus curiae* for Department of Land Conservation and Development.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

WARREN, P. J.

### WARREN, P. J.

The issue in this mandamus action is whether petitioner Jackson Creek Sand Company's (petitioner) proposed commercial gravel extraction and processing operation is "auxiliary" to a forest practice. If so, it is exempt from Jackson County's (the county) land use regulations. If not, those regulations require petitioner to obtain a conditional use permit before beginning work. The trial court held that the operation was auxiliary to the forest practice of reforestation, because it would provide money to pay for that reforestation. It therefore granted petitioner's motion for summary judgment, denied the county's cross-motion, and ordered the county to certify to the Oregon Department of Geology and Mineral Industries (the Department) that the proposed operation is an outright allowable use. We reverse and remand with instructions to grant the county's motion for summary judgment.

Most of the facts are undisputed. Because of the decision that we reach, we will construe them most favorably to petitioner. Petitioner owns the mineral rights to approximately 160 acres that are located about one mile west of Jacksonville, outside its urban growth boundary.[1] The property is in a forest reserve zone and has been used for growing and harvesting timber for many years. The most recent logging mentioned in the record occurred during the year immediately before the filing of this case.

The focus of this dispute is a 30-acre portion of the property that was once the location of a gold mine. The mine operated during the first part of this century and continued sporadically until about 1940. Much of the area where the mining occurred is honeycombed with tunnels, at least some of which are close enough to the surface to make it unsafe to operate heavy equipment above them. The tunnels have deteriorated and become hazardous to enter. According to petitioner and its expert, those near the surface have also deprived the trees above them of necessary moisture and

---

[1] One of petitioner's shareholders owns the fee simple title to the property. The same person appears to act for both petitioner and for the owner of the property with regard to its use. No party raises any issue related to the divided ownership.

support, with the result that the trees are small and unhealthy. The county's expert disputes whether the tunnels could have that effect.

At the request of the owner of the land, a forester prepared a Stewardship Incentive Plan (the Plan) for future activities on the property. At least part of the purpose of the Plan was to qualify for financial assistance in conducting forest practices on the property. According to the Plan, its goal is to enable the owner to manage the property "in a way that forestry goals and objectives can be met while maximizing the total return from managing *all* the resources on the property." (Emphasis in original.)

The Plan describes petitioner's intended procedures for the gravel extraction and processing operation that it plans to conduct on 11 acres within the 30-acre area. Petitioner will divide the 11 acres into four sections. It will clear the vegetation from the first section and from a nearby location outside of the 11 acres, remove the overburden from the first of the four sections, store it on the nearby location, and proceed to remove and process the base rock on the first section. As part of doing so, it will collapse the tunnels on that section. When the first section is finished, petitioner will remove the overburden from the second section, place it on the first section, and reforest that section. It will continue in that fashion until it has completed all four sections. At that point it will place the stored overburden from the first section on the fourth section, reforest it, and be finished. The entire operation will take from 10 to 15 years. The gravel will be sold commercially; at the most, only minor amounts will be used on the property itself.

Under the county's acknowledged comprehensive plan and land use ordinances, petitioner's proposed operation would normally require a conditional use permit. Petitioner argues, however, that it is exempt from that requirement under ORS 527.722(1), which provides that, despite otherwise applicable land use statutes,

"except as provided in subsections (2), (3) and (4) of this section, no unit of local government shall adopt any rules, regulations or ordinances or take any other actions that prohibit, limit, regulate, subject to approval or in any other

way affect forest practices on forestlands located outside of an acknowledged urban growth boundary."

ORS 527.620(9) defines "forest practice" to mean

"any operation conducted on or pertaining to forestland, including but not limited to:

"(a)   Reforestation of forestland;

"(b)   Road construction and maintenance;

"(c)   Harvesting of forest tree species;

"(d)   Application of chemicals; and

"(e)   Disposal of slash."

Petitioner argues that its proposed gravel extraction operation is auxiliary to the forest practice of reforestation, because destroying the tunnels and creating a solid base for the soil is necessary to reforest what is now inadequately watered and unproductive forest land. The land cannot be productive until the impacts of the gold mining are gone. The proposed operation, petitioner says, is simply a means to attain that ultimate end.

Petitioner, relying on these arguments, asked the county to certify to the Department that the proposed operation is a permitted use of the land. When the county refused to issue that certification, petitioner filed this mandamus action under ORS 34.105 to ORS 34.240,[2] arguing that the county had a mandatory duty to do so. The trial court agreed and issued the peremptory writ from which the county appeals.

The county relies on ORS 527.722(2)(e) to support its position that ORS 527.722(1) does not override its acknowledged comprehensive plan and land use regulations.[3] That statute provides:

---

[2] Petitioner sought a traditional writ of mandamus, not a special statutory writ under ORS 215.428(7) or ORS 227.178(7). *See Murphy Citizens Advisory Com. v. Josephine County*, 325 Or 101, 934 P2d 415 (1997). The parties do not dispute that this is an appropriate issue for mandamus. In light of our disposition, we do not need to consider that question.

[3] Because the issue in this case is the impact of ORS 527.722(2)(e), which provides an exception to the general preemption of county regulation of forest practices on forest lands, the decision in *1000 Friends of Oregon v. LCDC (Tillamook Co.)*, 303 Or 430, 737 P2d 607 (1987), does not affect our decision.

"(2) Nothing in subsection (1) of this section prohibits local governments from adopting and applying a comprehensive plan or land use regulation to forestland to allow, prohibit or regulate:

"* * * * *

"(e) Physical alterations of the land, including but not limited to those made for purposes of exploration, mining, commercial gravel extraction and processing, landfills, dams, reservoirs, road construction or recreational facilities, *when such uses are not auxiliary to forest practices*[.]" (Emphasis supplied.)

Under this provision, despite the general prohibition on local regulation of forest practices, the county *may* regulate uses that involve physical alterations to the land, *unless* they are auxiliary to forest practices. For physical alterations, regulation is the rule, exemption from regulation the exception.[4]

In order to be exempt, the physical alteration of forest land must be auxiliary to a forest practice. The use of that term in itself shows that the physical alteration is subordinate to the forest practice; one does not describe a primary activity as "auxiliary" to a secondary activity. Rather, an auxiliary activity supports the primary activity or enables the primary activity to occur. That point is clear from the definition of "auxiliary" in the Goal 4 rule, a definition that the county adopted for its land use ordinances and that the parties agree applies to this case.

■    OAR 660-06-025(2)(d) provides:

" '[A]uxiliary' means a use or alteration of a structure or land which provides help or is directly associated with the conduct of a particular forest practice. An auxiliary structure is located on site, temporary in nature, and is not designed to remain for the forest's entire growth cycle from planting to harvesting.[5] An auxiliary use is removed when a particular forest practice has concluded."

---

[4] The Goal 4 rule and the relevant county ordinance, which follows the rule, change the wording slightly to provide that physical alterations of land auxiliary to forest practices are allowed in forest zones. OAR 660-06-025(2)(c). That does not change the statutory focus on authorizing regulation *unless* the use is auxiliary to a forest practice.

[5] ORS 527.722(2)(c) provides that a local government may regulate the establishment or alteration of a structure on forest lands "other than temporary on-site

Under this definition, an auxiliary use must help or be directly associated with the *conduct* of the forest practice. "Conduct" refers to the physical carrying out of the practice. Thus, the auxiliary use must be *physically* associated with, or *physically* help, the forest practice. Other kinds of assistance do not satisfy this requirement. The trial court's suggestion that the proposed operation was auxiliary to reforestation because it would provide money that petitioner could use for that purpose misreads the rule.

■■    Thus, both under the normal meaning of the term and under the definition in the rule, an auxiliary use is secondary to the primary use. The auxiliary use provides help to the forest practice; it is not the focus of the effort.[6] It comes on the forest land in connection with the forest practice and terminates no later than when that practice ends. Building a road may be auxiliary because it supports the forest practices of planting, growing, logging, and removing timber. A gravel crushing operation may also be auxiliary because it provides material for that road. However, if the purpose of the road is to provide a route for the public at large to travel from one side of the forest to the other, the road is not auxiliary simply because it is also possible for log trucks to use it. The tail must not wag the dog.[7]

■    Petitioner argues that the proposed gravel operation would be auxiliary to forest practices because (1) it would directly impact only 11 acres, approximately seven percent of the property; (2) it would last 10 to 15 years, while it takes at least 30 to 40 years to grow a timber crop; (3) removing the tunnels would improve soil moisture conditions by providing solid base rock; (4) removing the tunnels would make it possible to operate heavy equipment in the area, which would

structures which are auxiliary to and used during the term of a particular forest operation[.]"

[6] In the same way, the auxiliary use is directly associated with the forest practice if it is physically connected to or otherwise physically assists in the conduct of that practice.

[7] Petitioner points out that other statutes and rules treat "accessory" uses as subordinate to primary uses. It argues that "auxiliary" must, therefore, be different from "accessory" and must refer to something other than a subordinate use. We see nothing in the statutes or rules that requires us to give these similar terms such different constructions. A lawmaker does not have to express its intentions through a limited vocabulary.

benefit forest practices on it. There is evidence in the record that supports each of these statements, although the county's expert disputes the third statement. Assuming these facts to be true, they are insufficient to show that the proposed gravel extraction operation would be auxiliary to forest practices. We therefore hold that the trial court erred in granting petitioner's motion for summary judgment and in denying the county's motion.

What petitioner proposes is to conduct a gravel strip mine on the property for a period of 10 to 15 years. That mine will not, during its existence, assist forest practices on the property. Rather, according to petitioner, the effects of the mining and the reclamation activities that will follow it will result in improved conditions for the trees that petitioner will then plant. During the life of the mine, however, the primary focus will clearly be on gravel extraction and processing. The operation will not simply be auxiliary to the ultimate reforestation.

Petitioner's arguments do not affect our conclusion that the use would not be auxiliary to reforestation. Because the operation would not benefit the rest of the property in any fashion, the percentage of the total property involved is not relevant to whether the activity on the 11 acres would be auxiliary to forest practices. Indeed, there would be no forest practices of any sort on changing portions of the 11 acres while the operation continued; it would also take nearby land out of forest use for 10 to 15 years in order to store overburden on it. The sporadic activity required while trees are growing is not comparable to the activity of a gravel mine. In any case, the comparison is irrelevant to whether the gravel operation is auxiliary—and thus secondary—to growing trees.

Reading the evidence most favorably to petitioner, the gravel extraction operation would eventually improve the condition of the soil on the 11 acres and would make it safe to operate heavy equipment on it. The operation would, thus, make the ultimate reforestation more effective. That does not, however, mean that the operation would be auxiliary to that reforestation. It is an independent operation that has its own purposes and that will produce its own profits. Any benefits that it may provide to reforestation will be incidental to

the primary purpose of mining, processing, and selling gravel. The proposed operation is better described as part of the petitioner's goal of maximizing the *total* return on the property by managing *all* of its resources, including nonforest as well as forest resources. To call it merely auxiliary to reforestation would be to allow the tail to wag the dog.

Reversed and remanded with instructions to grant defendant's motion for summary judgment.