Argued and submitted March 16, reversed and remanded on Jaquas' petition;
otherwise affirmed June 9, 2004

Robin JAQUA
and John Jaqua,
*Petitioners - Cross-Respondents,*

*and*

1000 FRIENDS OF OREGON,
*Cross-Respondent,*

*and*

LANE COUNTY,
*Intervenor below,*

*v.*

CITY OF SPRINGFIELD
and PeaceHealth,
Respondents - Cross-Petitioners.

COALITION FOR HEALTH OPTIONS IN
CENTRAL EUGENE-SPRINGFIELD,
Anne S. Heinsoo, Linda Maureen Cheney,
Fred Felter, and 1000 Friends of Oregon,
*Cross-Respondents,*

*and*

LANE COUNTY,
*Intervenor below,*

*v.*

CITY OF SPRINGFIELD
and PeaceHealth,
*Cross-Petitioners.*

2003-072, 2003-073, 2003-077, 2003-078; A123624

91 P3d 817

Allen L. Johnson argued the cause for petitioners - cross-respondents. With him on the opening brief were Corinne C. Sherton and Johnson & Sherton, P. C., and William G. Wheatley and Jaqua & Wheatley, P. C. On the reply and post-oral argument briefs were Allen L. Johnson and Johnson & Sherton, P. C.

Meg E. Kieran argued the cause for respondent - cross-petitioner City of Springfield. With her on the answering brief and the cross-petition, response brief, and rebuttal/reply brief were Joseph J. Leahy and Harold, Leahy & Kieran.

Stephen L. Pfeiffer argued the cause for respondent - cross-petitioner PeaceHealth. With him on the response brief and brief on cross-petition and response brief were Michael

C. Robinson, Steven P. Hultberg, Roger A. Alfred, and Perkins Coie LLP. With him on the supplemental brief were Steven L. Pfeiffer, Steven P. Hultberg, and Perkins Coie LLP.

William H. Sherlock filed the briefs for cross-respondents Coalition for Health Options in Central Eugene-Springfield, Anne S. Heinsoo, Linda Maureen Cheney, and Fred Felter. With him on the briefs was Hutchinson, Cox, Coons, Dupriest, Orr & Sherlock, P. C.

Michael K. Collmeyer argued the cause for cross-respondent 1000 Friends of Oregon. With him on the briefs was Mary Kyle McCurdy.

Glenn Klein, and Harrang Long Gary & Rudnick P.C. filed the brief *amicus curiae* for League of Oregon Cities.

Before Edmonds, Presiding Judge, and Wollheim and Schuman, Judges.

EDMONDS, P. J.

## EDMONDS, P. J.

Robin and John Jaqua, owners of nearby affected land, petition for judicial review of a Land Use Board of Appeals (LUBA) decision regarding two City of Springfield ordinances. In addition, the City of Springfield (city) and PeaceHealth, the developer of a proposed regional hospital complex on the subject lands, cross-petition for judicial review of LUBA's decision.[1] The challenged ordinances amend a regional land use plan and a refinement of that plan, and they facilitate the future rezoning of 99 acres within the city for purposes of PeaceHealth's development. We reverse on the Jaquas' petition and affirm on the city's and PeaceHealth's cross-petitions for review.

We take the facts from LUBA's opinion *Jaqua v. City of Springfield*, 46 Or LUBA 134, 138-40 (2004):

"Intervenor-respondent PeaceHealth (hereafter Peace-Health) wishes to construct a hospital on approximately 66 acres of land and construct related commercial development on 33 acres of land. The area where this disputed construction would take place is located within the acknowledged regional urban growth boundary (UGB). The property that is at the center of [the] dispute is subject to (1) a regional plan (the Eugene/Springfield Metro Area General Plan (Metro Plan)); (2) a refinement of the Metro Plan (the Gateway Refinement Plan (GRP)); and (3) city land use regulations that have been adopted to implement those plans (the City of Springfield Development Code (SDC)).

---

[1] The Coalition for Heath Options in Central Eugene-Springfield (CHOICES), Anne S. Heinsoo, Linda Maureen Cheney, and Fred C. Felter also filed a petition for judicial review. We dismissed the petition because it was filed on the twenty-second day following LUBA's decision on review, one day later than the 21-day limit specified in ORS 197.830(3)(a) and ORS 197.850(3)(a). The petitioners ask that we vacate our order and, in substance, treat their petition as a cross-petition. *See* ORAP 4.68(1). We decline to do so. CHOICES's citation to *State ex rel Dodd v. Joseph*, 313 Or 333, 833 P2d 1273 (1992), is unavailing because its conduct in this proceeding is unlike that of the successful cross-petitioner in *Dodd*. In *Dodd*, the relators did not challenge this court's dismissal of their untimely petition for judicial review but instead, and after another party properly filed a petition for judicial review, timely filed a cross-petition. CHOICES did not file a cross-petition to transform its petition into a cross-petition under ORAP 4.68. To accept its argument would have the effect of waiving the time limit on filing petitions for judicial review set out in ORS 197.830(3)(a) and ORS 197.850(3)(a).

"The GRP area is an approximately 1,000-acre area in the northwestern part of the City of Springfield lying east of Interstate Highway 5 and south of the McKenzie River. Approximately 180 acres of the GRP area is designated Medium Density Residential (MDR) by both the Metro Plan and the GRP.

"The challenged decisions adopt the Metro Plan and GRP map designations for up to 33 acres to Community Commercial (CC). The challenged decisions authorize a change in city zoning for those 33 acres from MDR to Mixed Use Commercial (MUC). Finally, the challenged decisions authorize application of the city's Medical Service (MS) zone to the 66 acres where the hospital is proposed. The existing Metro Plan and GRP maps for the 66 acres are not changed, and those 66 acres retain their MDR Metro Plan and GRP map designations.

"To summarize, the plan map and zoning map changes adopted by the challenged decisions apply to a portion of the 180-acre MDR-designated portion of the GRP area. The decisions (1) change the Metro Plan map, and GRP Plan map designations for 33 acres to CC; (2) authorize future rezoning of those 33 acres to [MUC]; and (3) authorize future rezoning of 66 acres to MS.

"In addition to the above-described map changes, one of the ordinances also adopts a number of changes to the GRP text. Among other things, those changes *require* development of a large hospital on the MS-zoned area and require a master plan review process to consider any application to develop the hospital and related commercial and residential development on the 99 acres. Both ordinances adopt a number of conditions that, among other things, are intended to limit traffic impacts and to ensure provisions of needed supporting public facilities to the development proposed for those 99 acres."

(Emphasis in original; footnotes omitted.)

After the city adopted its ordinances, the Jaquas, CHOICES, Lane County, and 1000 Friends of Oregon appealed its decisions to LUBA. LUBA remanded the matter for findings of compliance with Statewide Land Use Planning Goals 9 (Economic Development) and 12 (Transportation)

but otherwise affirmed the city's planning decisions. Thereafter, the Jaquas sought review by this court of LUBA's decision, and the city and PeaceHealth filed cross-petitions for review. The Jaquas make three assignments of error: They assert that (1) LUBA erred by ruling that the ordinances do not violate the Eugene/Springfield Metro Area General Plan's (Metro Plan) limited authorization for "auxiliary" uses on land designated for residential use; (2) LUBA erred when it ruled that the proposed hospital complex and related nonresidential uses do not violate statewide planning goals and statutes; and (3) LUBA erroneously interpreted the Metro Plan not to require the participation of Lane County and the City of Eugene, the other participants in the plan.

The city and PeaceHealth make two assignments of error on cross-appeal. First, they argue that LUBA erred when it concluded that the city's findings did not demonstrate that the ordinances were consistent with the Springfield Commercial Lands Study (SCLS) and with Goal 9. Under those rules, local jurisdictions are required to demonstrate compliance with local Goal 9-related components of local comprehensive plans. Second, they contend that LUBA erred when it concluded that the city incorrectly interpreted the Transportation Planning Rules (TPRs) in OAR chapter 660, division 12, by construing it not to require the resolution of transportation issues until the end of the planning period in 2018.

■    We turn first to the Jaquas' third assignment of error, which raises the issue of whether the city could unilaterally amend the Metro Plan and the GRP without the consent of Lane County and the City of Eugene. A decision on that issue adverse to the city could operate to nullify both ordinances. The parties do not appear to dispute the basic requirements for amendments to the Metro Plan and the GRP. All three jurisdictions—the city, the City of Eugene, and Lane County—adopted the Metro Plan and the GRP, but unilateral amendments by a single jurisdiction are contemplated by the plans if certain conditions are present. Under the plan, any "Type I" amendment generally requires the participation of all jurisdictions. Springfield Development Code (SDC) 7.070(1). A Type I amendment is defined as

"[a]ny change to the Metro Plan which (1) changes the urban growth boundary or the jurisdictional boundary of the Plan; (2) requires a goal exception not related to a UGB expansion to be taken under statewide planning goal 2; or, (3) is a non-site specific amendment of the Plan text."

SDC 7.030; *see also* Metro Plan, Plan Amendments and Refinements, Policies 3. On the other hand, Type II amendments regarding an area inside city limits may be made unilaterally by a member of the plan. SDC 7.070(2). A Type II amendment is

"[a]n amendment to the Metro Plan which is not otherwise a Type I plan amendment and which: (1) changes the Plan diagram; or, (2) is a site-specific Plan text amendment."

SDC 7.030.

The parties disagree as to whether the city's amendments to the Metro Plan in the ordinances are Type I or Type II amendments. Their disagreement turns on the meaning of the words "site specific" in the plan. Those words are not defined in the plan and should therefore be given their plain, natural, and ordinary meaning within the text and the context of the plan itself. *See, e.g., Department of Land Conservation v. Lincoln County*, 144 Or App 9, 14-15, 925 P2d 135 (1996), *rev den*, 324 Or 560 (1997). The city held that the amendments apply only to property wholly within the city after annexation occurs and entirely within the GRP area.[2] It reasons that the amendments therefore were "site specific" within the meaning of the plan. The city also points out that the Metro Plan applies to the entire Eugene metropolitan area and that some of the objectives of the plan are applicable to the entire geographic area. In contrast, it says that the identification of the McKenzie/Gateway MDR site in the plan and the GPR is sufficiently definite to be considered "site specific" within the meaning of those words as used in the plan. The Jaquas, on the other hand, argue for a more restrictive interpretation of the term. They contend that the

---

[2] Apparently, there are approximately 10 acres of MDR property that are not presently within the city.

"site-specific" requirement requires the designation of a specific site and not of a general area such as "up to 33 acres" or "up to 66 acres" as challenged in the ordinances.

LUBA concluded, and we agree, that the Metro Plan operates as a general plan and that it contemplates that it will be supplemented, as the plan states, "by more detailed refinement plans, programs and policies." The GRP is one such plan that operates to refine the Metro Plan. For instance, the GRP maps are more detailed than the Metro Plan maps and show particular lots and parcels. Also, the GRP explains that its purpose with regard to residential lands "is to provide *site-specific* application of adopted Metro Plan residential land use designations, to resolve plan/zone conflicts, and to resolve land use conflicts as they relate to the livability of residential neighborhoods." (Emphasis added.) Thus, it appears from the text of the Metro Plan that the amendments to the GRP are the kind of actions affecting particular properties that the Metro Plan contemplates as "site-specific" implementing measures; in other words, the amendments are an example of the site-specific measures that the Metro Plan authorizes individual jurisdictions to take without the participation of other plan participants. Accordingly, we conclude that the city's ordinances are site-specific amendments within the meaning of a Type II amendment to the Metro Plan.

■     We return to the Jaquas' first assignment of error. At issue is the meaning of the following language in the Metro Plan regarding the designation of land use as "residential":[3]

[3] We are mindful of the city and PeaceHealth's view that LUBA, and we, are obliged to defer to the city's understanding of the terms of its own land use regulations. That obligation, and the construction of local ordinances, is mandated by ORS 197.829 and *Clark v. Jackson County*, 313 Or 508, 836 P2d 710 (1992). However, it does not extend to affirming a local interpretation that alters the common definition of the operative words in the code. In short, we are not obliged to affirm an interpretation that is "inconsistent with the express language of the comprehensive plan or land use regulation[.]" ORS 197.829(1). Moreover, we observe that the city is only one of three participants in the plan. We question whether ORS 197.829 requires deference to an interpretation by only one participant when land use regulations are promulgated by multiple land use planning bodies. However, we need not decide that question in this case because of the clear import of the language used in the provisions of the Metro Plan in issue.

"This category is expressed in gross acre density ranges. Using gross acres, approximately 32 percent of the area is available for auxiliary uses, such as streets, elementary and junior high schools, neighborhood parks, other public facilities, neighborhood commercial services, and churches not actually shown on the diagram. Such auxiliary uses shall be allowed within residential designations if compatible with refinement plans, zoning ordinances, and other local controls for allowed uses in residential neighborhoods."

Before LUBA, the Jaquas argued that the above language authorizing 32 percent of the area to be available for auxiliary uses has the effect of limiting auxiliary uses to neighborhood commercial uses and public facilities scaled to serve neighborhoods and that it does not authorize a large regional hospital facility with supporting commercial development, which is what the city's challenged ordinances contemplate. The city argued in turn that the "auxiliary uses" language expressly recognizes that nonresidential public facilities can occupy residential land and that refinement plans, such as the GRP, are available to implement such a policy.

Apparently, LUBA was concerned about the breadth of the city's argument. It commented that, if the question

"were whether the above-described Metro Plan provisions, viewed alone, can be interpreted to permit locating a regional hospital and supporting uses on 66 acres of a 180-acre MDR-designated area as an 'auxiliary' use to the residential uses that the MDR designation envisions, we would have little trouble agreeing with petitioners that the Metro Plan would not permit such a hospital development on MDR-designated land. The concept of 'auxiliary uses' viewed in the context of those Metro Plan provisions is simply not that broad."

LUBA, however, also concluded that, consistently with its language, the quoted Metro Plan provision delegated to individual participants in the plan "authority to further elaborate on the kinds of auxiliary uses that may be allowed on lands that the Metro Plan designates for residential use." (Footnote omitted.) According to LUBA, the city exercised its discretion under its delegated authority when it adopted a

Medical Services District (MSD)[4] in 1989 because of the Metro Plan's provision that "auxiliary uses shall be allowed within residential designations if compatible with refinement plans, zoning ordinances, and other local controls for allowed uses in residential neighborhoods." LUBA also concluded that "the individual cities and county [have the] authority to further elaborate on the kinds of auxiliary uses that may be allowed on lands that the Metro Plan designates for residential use."

LUBA determined that such an authorized delegation under the Metro Plan occurred in 1989, when the city adopted the MSD. The district has been in effect since that time as one of the city's acknowledged land use regulations. One of the challenged ordinances, Ordinance 6051, authorizes the future application of the MSD to up to 66 acres of MDR-designated land for primary medical and medically related uses. The 1989 enactment of the MSD furnishes the basis for the assertion by the city and PeaceHealth that "[no] analysis of the 'auxiliary use' language of the Metro Plan is necessary to allow the city to rely upon its own zoning regulations to rezone property."

Under SDC 22.010(3), an MSD may be created in Medium Density Residential as well in as other designated areas. According to the city and PeaceHealth, the adoption of the MSD by the city in 1989 was an authorized action under the Metro Plan because the SDC is an authorized interpretation of the Metro Plan, and the proposed application of the district to the lands subject to the ordinances is similarly authorized. The city and PeaceHealth also stress that the MSD, as adopted and acknowledged, has a three-acre minimum lot size and no maximum lot size. That is, the district may be applied only to properties larger than three acres. That fact, they argue, is further authority for the action in the challenged ordinance authorizing application of the district to 66 acres.

---

[4] We note that in LUBA's opinion and in the record the MSD is referred to as both a "medical services zone" and a "medical services district." Because the Metro Plan uses the term "Medical Services District," we also use that term.

Preliminarily, LUBA observed that it "would have been a relatively simple matter for the city to include language in the MS zone to limit the hospitals and hospital expansions authorized in the MS zone to sub-regional or limited, community-oriented facilities. However, there is no such limiting language." It then concluded that the enactment of the MSD and the fact that it is acknowledged as being in compliance with the Statewide Land Use Planning Goals were controlling, and it therefore held that the challenged ordinances were not inconsistent with and were authorized by the Metro Plan because of the city's earlier adoption of an MSD.[5]

On review, the Jaquas argue that

"[t]he plain meaning of the complete text of the delegating language is that only uses similar in type, scale, and relationship to the principal uses may be allowed through subsequent planning processes. It does not prescribe the conditions under which uses outside that range can be added to the class. The Metro Plan authorizes Eugene, Springfield, and Lane County to decide unilaterally later only (a) whether a proposed use is a use 'such as' the auxiliary uses and (b) * * * whether, and under what conditions to allow auxiliary uses such as parks, schools, streets and churches on residential lands within the jointly adopted Eugene-Springfield Metro Plan urban growth boundary."

As to the city's authority to exercise its discretion with regard to the creation of an MSD, the Jaquas contend that

"there was no such discretion to exercise. The Metro Plan only delegates discretion to authorize and allocate those 'auxiliary uses' that fall within the range of 'such uses' as defined and limited by the Metro Plan."

---

[5] LUBA explained,

"We do not mean to suggest that the city has absolute discretion to develop its own list of auxiliary uses that are allowed in MDR-designated areas. However, the Metro Plan is somewhat ambiguous in how it views hospitals and expressly states that they present complex siting questions. * * * Other than disagreeing with the city's interpretation of the scope of the MS zone, petitioners offer no basis for us to conclude that the city's interpretation of the acknowledged MS zone, or the manner in which it harmonizes that zone with the Metro Plan, is beyond the city's interpretive discretion under ORS 197.829(1)."

The city and PeaceHealth counter that the Jaquas' challenge is precluded by the adoption of the MSD in 1989 and the fact that it is an acknowledged land use plan. They argue that the Jaquas should have challenged the provisions of the MSD at that time and that a challenge to the ordinances at issue in this appeal comes too late because it is an acknowledged zone. Thus, they conclude that we should reject the Jaquas' challenge as an impermissible collateral attack on the 1989 ordinance creating the MSD.

In the alternative, PeaceHealth argues that the Jaquas' challenge to the city's two ordinances is premature. As we understand its argument, PeaceHealth asserts that, because the ordinances on review do not approve a master plan authorizing specific developments in the subject area by applying the MSD to property within the Gateway District, any challenge by the Jaquas must await that future action by the city. PeaceHealth also argues that the city did not rely on the auxiliary use provision in the Metro Plan when it promulgated the ordinances. It points to the city's findings rejecting any "explicit or implied" action to "correlate medical uses with the auxiliary use definition in the Metro Plan." Instead, PeaceHealth echos the city's alternative contention that the city simply authorized future application of the MSD to 66 acres of MDR-designated land as it understood the Metro Plan and the 1989 ordinance to permit it to do.

Finally, the city and PeaceHealth assert that the list of auxiliary uses stated for designated residential areas in the Metro Plan is not exclusive. They point to the use of the words "such as." In their view, those words, when read with the remainder of the phrase indicate

> "that the Metro Plan did not intend the list of auxiliary uses to be exclusive. Had the City intended the list to be exclusive, it would have used a phrase like 'only the following non-residential uses shall be allowed' or a similar phrase."

We consider first whether the Jaquas' challenge to the two ordinances at issue constitutes a collateral attack on the 1989 creation of an MSD. It is significant to their argument that the 1989 ordinance is general in nature and does

not expressly apply to the area that is the subject of the challenged ordinances. The Jaquas therefore direct their argument at the city's exercise of its authority to amend the GRP to authorize application of the MSD to a particular area initially designated for MDR use and their auxiliary uses for nonresidential uses. As we understand their argument, it is the city's amendment of the GRP authorizing the use of the MSD to justify the change in use designation on the property in question that violates the Metro Plan policy regarding residential use, not the creation of the MSD itself. Consequently, in their view, there would have been nothing for them to challenge in 1989. So far as they are concerned, a controversy arose only after the city paved the way for the application of the Medical Services classification to particular lands that affect them by the enactment of the ordinances that are the subject of this litigation.

We agree with the Jaquas' position. There is no question that the ordinances that LUBA reviewed are final land use decisions as defined in ORS 197.015(10) and are subject to review under ORS 197.825. The ordinances do not "rezone" the subject area by applying the MSD; rather, they eliminate the legal barriers to future application of the district, and they authorize future development consistent with the terms of the ordiances creating the MSD (Ordinance 6051) and the Mixed Use Commercial zone (Ordinance 6050). In effect, the ordinances on review determine what future actions are consistent with the GRP and the Metro Plan. The Jaquas' challenge is therefore not premature, nor is it precluded by the 1989 creation of an MSD; it comes at the proper time to challenge the authority of the city under the Metro Plan to amend its land use regulations regarding an area designated by the plan for residential use.

We also reject for related reasons the city's and PeaceHealth's argument that no analysis of the "auxiliary use" language in the Metro Plan is necessary because the city's creation of an MSD in 1989 authorized the district's location "[o]n arterial streets where Community Commercial, Major Retail Commercial, Medium Density Residential or High Density Residential Metro Plan designations exist." The city and PeaceHealth's argument puts in issue the scope of the authority delegated by the Metro Plan to the city to

make amendments to the use of lands designated for a particular use by the plan. Under the city's view, the enactment of an MSD, an enactment permitted by the Metro Plan, authorizes it to locate an MSD wherever it desires. But that view is at odds with the terms of the Metro Plan itself. Rather, the Metro Plan permits the location of an MSD in a residential area only when it will constitute an "auxiliary" use to the residential area. Because the authority to create an MSD on lands designated for residential use by the Metro Plan is derived from the provisions of the plan itself, it necessarily follows that any restrictions or limitations imposed by the plan on the auxiliary uses of designated residential lands also attach to the location of such a district. Otherwise, the city's exercise of authority in creating an MSD would swallow up the provisions of the Metro Plan, thereby eviscerating the land use controls agreed to and put in place by all the participants of the plan. While the plan authorizes a participant to implement a Type II amendment unilaterally, it must do so within the constraints of the plan itself. Those constraints are at least two-fold: the amendment must be site-specific, and it must conform to the plan's requirement for areas designated for residential use. One of those requirements is that a nonresidential use be auxiliary in nature. That observation leads us to conclude that the city's ordinances creating an MSD in an area designated by the Metro Plan as residential must demonstrate that the uses permitted under the MSD qualify as "auxiliary" uses. Otherwise, the city through its ordinances has undertaken a *de facto* change in the text of the Metro Plan without complying with the applicable procedures for such a change.

We turn to the issue of whether the uses the challenged ordinances authorize on MDR land are permissible auxiliary uses under the Metro Plan for an MDR area. As discussed earlier, LUBA relied on the fact that the text of the MSD establishes a minimum acreage for application, but does not provide a maximum acreage limitation. Also, the GRP recognizes that the Metro Plan establishes general land use policies to guide all land use decision-making in Springfield, Eugene, and Lane County. Refinement plans are used to implement specific application of Metro Plan policies, including site-specific determination of Metro Plan land use

designations. While both of those considerations provide context for determining the meaning of the plan, the more pertinent inquiry is in regard to the meaning of the word "auxiliary," for it circumscribes what nonresidential uses are available in an area designated for residential use.

An "auxiliary use" is not defined in the city's land use regulations, at least as the board understood the record before it. We are left to use a dictionary definition of "auxiliary." In this context, "auxiliary" means "functioning in a subsidiary capacity" or "supplementary." *Webster's Third New Int'l Dictionary* 149 (unabridged ed 1993). *See also State ex rel Jackson Creek Sand Co. v. Jackson Cty.*, 147 Or App 577, 938 P2d 773, *rev den*, 326 Or 57 (1997). Norman Williams, Jr. and John M. Taylor, 4 *American Land Planning Law* § 79:8 (2003) (listing elements of ordinance definitions of "accessory use" as requiring that the use be related to the principal use, be "subordinate and clearly incidental to the principal use," be customarily incidental to the principal use, be located on the same lot as the principal use and not "alter the character of the area or be detrimental thereto * * *"); *id.* at § 79:12 through 79:15 (addressing "principal use" and reviewing cases concerning accessory uses as related to the principal use, as subordinate and incidental to the principal use and as "customarily incidental" to the principal use). That understanding of the meaning of "auxiliary" leads us to examine the text of relevant provisions of the Metro Plan and its description of the principal use of areas designated as MDR. Under the Metro Plan's Plan Diagram, the Metro Plan sets out standards "intended to provide minimum guidelines to local jurisdictions in determining appropriate new and expanded sites and locations for such uses in urban areas."[6] As noted above, the Metro Plan contains a definition of the "Residential" designation (Residential Policy):

"This category is expressed in gross acre density ranges. Using gross acres, approximately 32 percent of the area is available for auxiliary uses, such as streets, elementary and junior high schools, neighborhood parks, other public facilities, neighborhood commercial services, and churches

---

[6] The diagram is "a generalized map and graphic expression of the goals, objectives, and recommendations found elsewhere in the *Plan*."

not actually shown on the diagram. Such auxiliary uses shall be allowed within residential designations if compatible with refinement plans, zoning ordinances, and other local controls for allowed uses in residential neighborhoods. The division into low, medium, and high densities is consistent with that depicted on the *1990 Plan* diagram. In other words:

"Low-Density Residential—Through ten units per gross acre Medium-Density Residential—Over 10 through 20 units per gross acre High-Density Residential—Over 20 units per gross acre

"These ranges do not prescribe particular structure types, such as single-family detached, single-family attached, manufactured dwellings in parks, or multiple-family. That distinction, if necessary, is left to local plans and zoning ordinances.

"While all medium- and high-density allocations shown on the diagram may not be needed during the planning period, their protection for these uses is important because available sites meeting pertinent location standards are limited."

The policy goes on to discuss the history of residential development density, stating that in 1994 it was 5.81 dwelling units per acre and then "calls for an overall average of about six dwelling units per gross acre for new construction through 2015."

There is further support for understanding the meaning of the word "auxiliary" as connoting something that functions or serves in a supplementary capacity in the examples of auxiliary uses contained within the plan itself. The Metro Plan grants authority to devote 32 percent of a residential district to "such" auxiliary uses as "streets, elementary and junior high schools, neighborhood parks, other public facilities, neighborhood commercial services, and churches." The use of residential lands for streets, elementary and junior high schools, *neighborhood* parks, *neighborhood* commercial services and churches are the kinds of land use that ordinarily function or serve in a supplementary capacity to a residential neighborhood. For example, streets and other public facilities exist in any residential area to

facilitate the residential use of the land, but they hardly constitute the primary use of land designated as residential. The same can be said of schools, neighborhood parks, neighborhood commercial services, and churches.

By comparison, the city's actions in this case change the universe of primary use of the area from residential to nonresidential. The proposed regional hospital project and adjoining medical and commercial services authorized by the ordinances are not mere adjuncts or supplements to residential use. They will become, in fact and in effect, the primary uses of the land; and they will, by their intrinsic nature, change the overall use of the land in the area from residential to commercial. We therefore conclude, based on our understanding of the meaning of the word "auxiliary" as used in the context of the Metro Plan, that the kinds of uses contemplated by the challenged ordinances are not permitted uses in an area designated for residential use. If the city wishes to use the area in question for the commercially related uses authorized by the ordinances, it will have to undertake a zone change or other change authorized by the plan.

Our conclusion should not be understood to subscribe to the notion apparently asserted by the Jaquas that the Residential policy operates to prohibit every hospital or commercial use in MDR designated areas. The "such auxiliary uses" language refers to a wide range of permitted uses including "neighborhood commercial services." It is certainly conceivable that a hospital could be a neighborhood commercial use within the meaning of the plan, at least to the same extent that other neighborhood commercial uses are similarly auxiliary and supportive. The text and context of the policy, however, require that such uses do not become the primary use in a MDR designated area, such as occurs under the ordinances. Thus, it is the extent and the pervasiveness of the proposed change in use that renders it legally incapable, within the meaning of the plan, of being characterized as auxiliary uses. In summary, our disagreement with LUBA's treatment of the city's ordinances under the Residential policy, a disagreement dictated by the plain meaning of the word "auxiliary," requires that we remand its decision.

Additionally, we agree with LUBA's rejection of the Jaquas' contention that the challenged ordinances violate Statewide Land Use Planning Goal 10 (Housing), and we affirm that ruling without further comment. Our decision today concludes only that LUBA erred in ruling that the city's challenged ordinances do not violate the Residential policy addressing auxiliary uses in MDR designated areas, and our holding should not be understood to mean that the city's application of the MSD to MDR-designated land will, in all possible applications, amount to a violation of the Metro Plan.[7]

■ We turn to the cross-petitions filed by the city and PeaceHealth challenging LUBA's conclusion that the ordinances at issue were inconsistent with OAR 660-012-0060, a portion of the TPRs.[8] In relevant part, OAR 660-012-0060(1) provides:

"Amendments to functional plans, acknowledged comprehensive plans, and land use regulations which significantly affect a transportation facility shall assure that allowed land uses are consistent with the identified function, capacity, and performance standards (e.g. level of service, volume to capacity ratio, etc.) of the facility. This shall be accomplished by either:

"(a) Limiting allowed land uses to be consistent with the planned function, capacity, and performance standards of the transportation facility;

"(b) Amending the TSP[9] to provide transportation facilities adequate to reduce demand for automobile travel and meet travel needs through other modes; or

---

[7] We are mindful of the city and PeaceHealth's complaint that, if the Jaquas' argument is accepted, then the matter of exactly what size of development would fit within the term "auxiliary use" becomes uncertain. But it seems to us that that is a more appropriate matter for the local planning body to determine so long as its decision remains faithful to the language of the Metro Plan.

[8] We do not address cross-petitioners' assertion that LUBA erred in concluding the amendments were not consistent with the SCLS. LUBA's conclusion rested on what it saw as a failure to provide an adequate explanation of compliance with the study. In general, we agree with LUBA's assessment. On remand, assuming that the city's decision is consistent with the SCLS, a condition precedent that we do not address here, the city should be able to provide a revised or more complete explanation.

[9] A transportation systems plan (TSP), is a local planning jurisdiction document required under the TPRs. The TSP, among other things, sets the minimum

"(c) Altering land use designations, densities, or design requirements to reduce demand for automobile travel and meet travel needs through other modes; or

"(d) Amending the TSP to modify the planned function, capacity and performance standards, as needed, to accept greater motor vehicle congestion to promote mixed use, pedestrian friendly development where multimodal travel choices are provided."

OAR 660-012-0060(2) defines when a land use amendment "significantly affects a transportation facility":

"A plan or land use regulation amendment significantly affects a transportation facility if it:

"(a) Changes the functional classification of an existing or planned transportation facility;

"(b) Changes standards implementing a functional classification system;

"(c) Allows types or levels of land uses which would result in levels of travel or access which are inconsistent with the functional classification of a transportation facility; or

"(d) Would reduce the performance standards of the facility below the minimum acceptable level identified in the TSP."

At issue before LUBA was whether city transportation facilities were significantly affected under the two challenged ordinances and under the Oregon Highway Plan (OHP) Action 1F.6.[10] The OHP, among other standards, establishes levels of service on volume-to-capacity ratio for a traffic facility. The OHP Action statement establishes a trigger for a finding that a land use action "significantly affects" a transportation facility, and it further establishes a standard of performance should there be such a circumstance.

---

acceptable level of service of a transportation facility. OAR 660-012-0020. "Transportation facilities" are "any physical facility that moves or assists in the movement of people or goods, including facilities identified in OAR 660-012-0020 but excluding electricity, sewage and water systems." OAR 660-012-0050(24).

[10] The parties do not explain the legal status of the Oregon Highway Plan. We note that the plan is not an administrative rule and is not codified in statute, although it is referred to as establishing certain highway standards. *See, e.g.*, OAR 734-051-0190 (addressing standards for highway access control).

In this case, PeaceHealth identified over 50 state and local transportation facilities that would be impacted by the traffic generated by the development contemplated under the two ordinances. The analysis of the impacts was included in a "transportation impact analysis" (TIA). The TIA assumed that certain transportation improvements would be constructed before the end of the 2018 planning period. Under that assumption, there would be no violation of established performance standards, with one exception. To address the one anticipated failure, the city imposed a condition that PeaceHealth immediately provide funding needed to improve the facility likely to fail. Thus, with the assumption that all other improvements would be made before 2018, the city concluded there would be no "significant" effect on a transportation facility.

The Jaquas argued to LUBA that the city must consider under OAR 660-012-0060 whether the proposed changes would cause or accelerate failure of a transportation facility *within* the planning period. They contended that the rule did not permit PeaceHealth to wait until 2018 to make all the needed improvements. According to the Jaquas, if a transportation failure occurs even temporarily during the planning period, the city is obliged to apply one or more of the mitigating measures set out in OAR 660-012-0060(1) until the failure is corrected by construction of improvements. LUBA agreed with petitioners' argument, relying on our opinion in *ODOT v. City of Klamath Falls*, 177 Or App 1, 8, 34 P3d 667 (2001), in which we opined that there was nothing in the text or the context of the TPRs that can be read to require that "the effects of a proposed action may be measured only at the end of the planning period." For that reason, LUBA remanded the issue back to the city for further findings.

In *Klamath Falls*, we examined the text and the context of the rule and thereafter rejected the petitioner's argument that a determination of whether an amendment to a land use regulation significantly affects a transportation facility should be determined at the end of the planning period. We observed that, if compliance could await the end of the planning period, the provisions of the rule providing interim, alternative means of ensuring compliance would be rendered meaningless. *Id.* at 8. Rather, the rule requires

local governments to address whether a temporary failure of a transportation facility will occur if approval is given and, if failure will occur, to implement mitigating measures until the failure is corrected. Here, LUBA reasoned correctly that OAR 660-012-0060 serves to *prevent* local governments from engaging in land use decision-making without considering whether transportation systems can accommodate the proposed use. In addition, LUBA correctly refused to treat the rule as not being concerned with temporary facility failures because to do so would ignore the fact that a temporary failure might extend well beyond the planning period.

Nonetheless, PeaceHealth and the city disagree with LUBA's analysis and assert, among other arguments, that LUBA's opinion will require that transportation facilities be constructed concurrently with new developments rather than be completed at the end of the planning period. *Amicus* League of Oregon Cities agrees with that argument, asserting:

> "[LUBA's] majority [ ] interpretation will require cities and other governmental entities to engage in piece-meal and ad hoc decision making with respect to the timing of transportation system improvements. Such ad hoc, piece-meal decision-making will result in the construction of projects that provide fewer benefits to the transportation system as a whole prior to more beneficial projects, thereby preventing the governmental entities from carrying out those transportation improvements in the most cost effective and efficient manner."

In construing an administrative rule, we apply the same analytical framework applicable to the construction of statutes. *Alanis v. Barrett Business Services,* 179 Or App 79, 82, 39 P3d 880 (2002). We look first to the text and context of the rule, giving effect to the words in the rule in accordance with their ordinary meaning. First, we do not understand LUBA's opinion to do more than conclude that an interim failure of an affected facility is a significant "effect" on a transportation facility under OAR 660-012-0060(2) and that, consequently, the mitigation measures set out in the rule at subsection (1) must be considered. Our understanding (and LUBA's) does not mean that the rule necessarily requires that, before an approved change in land use occurs, road

improvements must occur. The rule offers alternatives to the local land use planning body. However, importantly, the rule does not authorize any delay in implementing the mitigating factors in subsection (1) until the end of the planning period once it is determined that a land use regulation significantly affects a transportation facility. The rule means what it says. Subsection (2) of the rule identifies certain criteria for determining whether a land use regulation "significantly affects a transportation facility," and, if one of those criteria exists, subsection (1) is explicit about what must occur. If we were to write the qualification into the rule that the city, Peace-Health and *amicus* propose, we would be undertaking a legislative function to add terms to the rule that, simply, are not expressed in it.[11] Accordingly, their complaints must be addressed elsewhere, and we agree with LUBA's decision remanding the matter back to the city for further findings.

The parties' other arguments do not warrant discussion.

Reversed and remanded on Jaquas' petition; otherwise affirmed.

---

[11] *See* ORS 174.010 (the office of the judge is not to add words to a statute or to delete words therefrom but to declare what is contained therein).