Argued and submitted June 18, reversed and remanded December 29, 2004

# FRIENDS OF EUGENE
## and Coalition for Health Options
## in Central Eugene-Springfield,
*Petitioners,*

*v.*

## CITY OF EUGENE
## and PeaceHealth,
*Respondents.*

### 2003-188; A124714

103 P3d 643

Jannett Wilson argued the cause and filed the briefs for petitioners.

Emily N. Jerome argued the cause for respondent City of Eugene. With her on the briefs was Harrang Long Gary Rudnick, P.C.

Steven L. Pfeiffer, Steven P. Hultberg, and Perkins Coie LLP, filed the briefs for respondent PeaceHealth.

Before Brewer, Chief Judge, and Schuman, Judge, and Deits, Judge pro tempore.

DEITS, J. pro tempore.

**DEITS, J. pro tempore**

Petitioner Coalition for Health Options in Central Eugene-Springfield (CHOICES) seeks review of a Land Use Board of Appeals (LUBA) decision, affirming the City of Eugene's (the city) ordinance amending its zoning code to make "it easier to site hospitals in certain residential and industrial zones."[1] *Friends of Eugene v. City of Eugene*, 46 Or LUBA 721, 722 (2004). Because we conclude that the city's ordinance is inconsistent with the Metro Plan, LUBA's order affirming the ordinance is unlawful in substance. Accordingly, we reverse and remand. ORS 197.850(9)(a).

As LUBA explained,

---

[1] Friends of Eugene (Friends) is also named as a petitioner on review. ORS 197.850(1) provides that "[a]ny party to a proceeding before the Land Use Board of Appeals under ORS 197.830 to 197.845 may seek judicial review of a final order issued in those proceedings." Friends, however, was dismissed as a party before LUBA for lack of standing. *Friends of Eugene v. City of Eugene*, 46 Or LUBA 721, 722 (2004). Nonetheless, it is named as a party on review and filed an opening brief with CHOICES. That brief, however, states, in part, that

> "the Final Opinion and Order from LUBA dismissed Petitioner Friends of Eugene from the LUBA appeal for lack of standing, because Friends of Eugene could not show that it appeared in the local proceedings. Petitioner [CHOICES] had appeared in the local proceedings, and thus parties below admitted that CHOICES had adequately established its own standing and could bring the appeal on its own. Petitioner CHOICES thus has standing as a party to the LUBA proceeding to bring this appeal, under ORS 197.850(1)."

(Record citations omitted.) Further, at oral argument before this court, the attorney for CHOICES and Friends stated that, on review, Friends was not challenging LUBA's dismissal and was not asserting that it obtained its standing at LUBA. Thus, under the circumstances of this case and based on the attorney's statements at oral argument and in the opening brief, we understand that the attorney for Friends has conceded that it is not a party on review.

Additionally, at oral argument in this case CHOICES requested the opportunity to submit affidavits to establish its constitutional standing. After allowing the parties to submit supplemental briefing, we issued an opinion in which we held that CHOICES has statutory standing and could submit evidence demonstrating its constitutional standing for the first time on judicial review. *Friends of Eugene v. City of Eugene*, 195 Or App 20, 22, 30, 96 P3d 1256 (2004). Thereafter, CHOICES submitted affidavits concerning the standing of two individuals who are on its steering committee. We are satisfied that CHOICES has constitutional standing in this court. *See, e.g., WaterWatch v. Water Resources Commission*, 193 Or App 87, 98, 88 P3d 327, *rev allowed*, 337 Or 476 (2004) ("We may consider the practical effects on specific individual members of an organization in our constitutional justiciability analysis.").

"[p]rior to the challenged decision, hospitals were allowed in the city's R-3 and R-4 (high density) residential zones, subject to a conditional use permit (CUP). The challenged decision adopts compatibility standards for hospitals in all residential zones and, so long as a proposed hospital complies with all applicable development standards, allows hospitals without a CUP in R-3 and R-4 zones. The challenged decision also allows hospitals on major collector or arterial streets within the city's other residential zones, subject to a CUP."

*Friends of Eugene*, 46 Or LUBA at 725. In other words, under the ordinance, hospitals are outright permitted uses in the city's high density residential zones. Additionally, "[p]rior to the adopted amendments, hospitals were not allowed in industrial zones. The amendments make hospitals permitted uses in industrial zones." *Id.* at 732. The city's findings do not address a site-specific proposal. Instead, the city found that it is "reasonable to assume that a hospital development located under the provisions of this ordinance would occupy a site of no more than 40 acres." Of significance, however, the text of the ordinance does not establish the maximum size of the site that a hospital development could occupy.

On review, CHOICES contends that

"[t]he challenged amendments to the land use code allow hospitals and other major medical facilities as outright permitted uses in areas the comprehensive plan (the Metro Plan) designates and reserves for non-commercial uses, in violation of the requirement that the land use code be consistent with the Metro Plan."

More specifically, CHOICES makes two assignments of error that, in essence, raise the following two issues: (1) whether a hospital is an auxiliary use in a residential zone as contemplated by the Metro Plan and (2) whether a hospital is a complementary use in an industrial zone as contemplated by the Metro Plan.

The city and PeaceHealth respond that, because the Metro Plan's list of auxiliary uses in residential zones is not exclusive, the city has authority to expand the list. Further, they contend that, when compared with other auxiliary uses, hospitals are similar in nature. Finally, the city and

PeaceHealth assert that CHOICES did not preserve the argument that it makes on review concerning the city's amendments to its industrial zones but that, if it did, LUBA correctly determined that those amendments were consistent with the Metro Plan.

■        We begin with CHOICES's first assignment of error concerning whether a hospital is an auxiliary use in a residential zone. As LUBA indicated, Eugene Code (EC) 9.8065 expressly authorizes the city council to adopt ordinances that are consistent with the Metro Plan, which is a regional comprehensive plan that was adopted by Lane County and the cities of Eugene and Springfield and that is considered a part of the city's comprehensive plan. *Friends of Eugene*, 46 Or LUBA at 723-24. As pertinent to this case, the Metro Plan contains the following language regarding auxiliary uses in areas designated for "residential" use:

"This category is expressed in gross acre density ranges. Using gross acres, approximately 32 percent of the area is available for auxiliary uses, such as streets, elementary and junior high schools, neighborhood parks, other public facilities, neighborhood commercial services, and churches not actually shown on the diagram. Such auxiliary uses shall be allowed within residential designations if compatible with refinement plans, zoning ordinances, and other local controls for allowed uses in residential neighborhoods."

In *Jaqua v. City of Springfield*, 193 Or App 573, 91 P3d 817 (2004), we addressed the meaning of the term "auxiliary uses" as used in the Metro Plan. In that case, the City of Springfield adopted ordinances that amended "a regional land use plan and a refinement of that plan, and * * * facilitate[d] the future rezoning of 99 acres within the city for purposes of PeaceHealth's development." 193 Or App at 576. In *Jaqua*, approximately 66 acres of the proposed site would have been devoted to the hospital and 33 acres would have been devoted to related commercial development. In reversing LUBA's order, we held that the City of Springfield's decisions did not allow for auxiliary uses as contemplated by the Metro Plan because the decisions would change the primary use in the area from residential to commercial. We explained:

"In this context, 'auxiliary' means 'functioning in a subsidiary capacity' or 'supplementary.' *Webster's Third New Int'l Dictionary* 149 (unabridged ed 1993). *See also State ex rel Jackson Creek Sand Co. v. Jackson County*, 147 Or App 577, 938 P2d 773, *rev den*, 326 Or 57 (1997). Norman Williams, Jr. and John M. Taylor, 4 *American Land Planning Law* § 79:8 (2003) (listing elements of ordinance definitions of 'accessory use' as requiring that the use be related to the principal use, be 'subordinate and clearly incidental to the principal use,' be customarily incidental to the principal use, be located on the same lot as the principal use and not 'alter the character of the area or be detrimental thereto * * *'); *id.* at § 79:12 through 79:15 (addressing 'principal use' and reviewing cases concerning accessory uses as related to the principal use, as subordinate and incidental to the principal use and as 'customarily incidental' to the principal use). * * *

"* * * * *

"There is further support for understanding the meaning of the word 'auxiliary' as connoting something that functions or serves in a supplementary capacity in the examples of auxiliary uses contained within the plan itself. The Metro Plan grants authority to devote 32 percent of a residential district to 'such' auxiliary uses as 'streets, elementary and junior high schools, neighborhood parks, other public facilities, neighborhood commercial services, and churches.' The use of residential lands for streets, elementary and junior high schools, *neighborhood* parks, *neighborhood* commercial services and churches are the kinds of land use that ordinarily function or serve in a supplementary capacity to a residential neighborhood. For example, streets and other public facilities exist in any residential area to facilitate the residential use of the land, but they hardly constitute the primary use of land designated as residential. The same can be said of schools, neighborhood parks, neighborhood commercial services, and churches.

"By comparison, the city's actions in this case change the universe of primary use of the area from residential to nonresidential. The proposed regional hospital project and adjoining medical and commercial services authorized by the ordinances are not mere adjuncts or supplements to residential use. They will become, in fact and in effect, the primary uses of the land; and they will, by their intrinsic

nature, change the overall use of the land in the area from residential to commercial. We therefore conclude, based on our understanding of the meaning of the word 'auxiliary' as used in the context of the Metro Plan, that the kinds of uses contemplated by the challenged ordinances are not permitted uses in an area designated for residential use."

*Jaqua*, 193 Or App at 587-89 (emphasis and first omission in original). In summary, we concluded in *Jaqua* that the Springfield ordinances were inconsistent with the Metro Plan's authorization for "auxiliary uses."

We declined, however, to accept the petitioners' contention in *Jaqua* that the Metro Plan's residential policy operated to prohibit every hospital or commercial use in the pertinent areas. We explained:

" '[S]uch auxiliary uses' language refers to a wide range of permitted uses including 'neighborhood commercial services.' It is certainly conceivable that a hospital could be a neighborhood commercial use within the meaning of the plan, at least to the same extent that other neighborhood commercial uses are similarly auxiliary and supportive. The text and context of the policy, however, require that such uses do not become the primary use in a [medium density residential] designated area, such as occurs under the ordinances. Thus, it is the extent and pervasiveness of the proposed change in use that renders it legally incapable, within the meaning of the plan, of being characterized as auxiliary uses. In summary, our disagreement with LUBA's treatment of the city's ordinances under the Residential policy, a disagreement dictated by the plain meaning of the word 'auxiliary,' requires that we remand its decision."

*Id.* at 589.

Our decision in this case is largely controlled by our decision in *Jaqua*. As we explained in *Jaqua*, the customary definition of "auxiliary" means "functioning in a subsidiary capacity" or "SUPPLEMENTARY." *Webster's Third New Int'l Dictionary* 149 (unabridged ed 2002). We were unwilling in *Jaqua,* and we are unwilling now, to hold that a hospital, clinic, laboratory, or similar use can *never* be an auxiliary use in a residential zone under the Metro Plan. Unlike in *Jaqua*, the city's actions in this case are not related to a particular

proposal and piece of property. Nonetheless, the pertinent question remains the same—that is, whether the city's ordinance changes "the universe of primary use of the area from residential to nonresidential." *Jaqua*, 193 Or App at 589.

Under the ordinance in this case, a proposed hospital and related development would be an outright permitted use in certain residential zones. In some circumstances, a proposed development may qualify as an auxiliary use under the Metro Plan. In other circumstances, however, the proposed development may not qualify. Because the parties have not cited to us provisions in the ordinance that require a proposed development to be consistent with the Metro Plan, we understand that the ordinance in this case would allow both types of proposed development. In other words, the parties have not identified anything in the ordinance that ensures that any proposed hospital and related development will be consistent with the Metro Plan's provision that such a proposed use be "auxiliary" to a residential use. Additionally, the parties have not identified anything in the ordinance that ensures that any proposed development will be consistent with the provision of the Metro Plan that limits the area available for auxiliary uses to approximately 32 percent of residentially designated land. Because the Metro Plan limits auxiliary uses to a certain percentage of the residentially designated land, and because we hold here and held in *Jaqua* that an auxiliary use on residentially designated land under the Metro Plan must be supplemental or must function in a subsidiary capacity to the primary residential use, some mechanism to ensure that a proposed development complies with the Metro Plan is essential. For that reason, LUBA erred in concluding that the city's ordinance allowing hospitals in residential zones is consistent with the Metro Plan.[2]

---

[2] To the extent that the city and PeaceHealth assert that LUBA, and this court, must defer to the city's interpretation of its own land use regulation, we reiterate our reasoning in *Jaqua*:

"We are mindful of the city and PeaceHealth's view that LUBA, and we, are obliged to defer to the city's understanding of the terms of its own land use regulations. That obligation, and the construction of local ordinances, is mandated by ORS 197.829 and *Clark v. Jackson County*, 313 Or 508, 836 P2d 710 (1992). However, it does not extend to affirming a local interpretation that alters the common definition of the operative words in the code. In short, we are not obliged to affirm an interpretation that is 'inconsistent with the express language of the comprehensive plan or land use regulation[.]' ORS 197.829(1)."

193 Or App at 580 n 3 (bracketed material in original).

■     We turn to CHOICES's second assignment of error. CHOICES contends that, even though the Metro Plan contemplates supporting commercial establishments as complementary uses in industrial zones, a hospital is not a complementary use because "the challenged amendments allow hospitals as *primary* industrial uses, with no limitation on the amount of industrial land that can be consumed." (Emphasis in original.)

The city and PeaceHealth begin by asserting that the argument that CHOICES raises on review was not raised to LUBA. Specifically, they argue:

> "[T]he City's brief informed LUBA that the City's zoning code (acknowledged by DLCD) allows numerous non-industrial uses in the Metro Plan's industrially designated areas. The City provided LUBA with a list of 15 such uses. LUBA agreed, stating that, '[u]nder [CHOICES's] interpretation most if not all of those permitted uses would violate the Metro Plan.' CHOICES now challenges the City's argument and evidence on the basis that essentially commercial uses can only be allowed as supporting uses for the primary industrial uses. In other words, CHOICES now concedes that the industrial designations are not reserved for the two specific uses it identified for LUBA, but now argues for the first time to this Court that a hospital is not the right *type* of use for the industrial areas. The Court should not consider CHOICES'[s] new challenge to the City's evidence. The issue was not preserved by CHOICES in its brief to LUBA, and to the extent that the issue[ ] was discussed at oral argument before LUBA, it could not have been considered in LUBA's decision. LUBA is prohibited from considering issues raised for the first time at oral argument. OAR 661-010-0040(1)."

(Second set of brackets and emphasis in original; record citations and footnote omitted.)

We do not agree that CHOICES failed to preserve the issue that it raises on review in this court. In its *brief* before LUBA, CHOICES asserted that

> "the city made no analysis at all of the inconsistency with the Metro Plan's definition of industrial uses. Heavy industrial lands are reserved for industries that process large volumes of raw materials into refined products and/or have

significant external impacts. Light-medium industrial
lands are reserved for assembly and processing plants,
warehouses, and transportation or communication facili-
ties. Campus industrial (special light industrial) lands are
reserved for regional distribution centers and research
parks. None of these uses is even remotely of the same
nature as a hospital."

(Internal quotation marks omitted.) As LUBA recognized,
CHOICES's "argument is reduced effectively to an argument
that a hospital is not of the 'same nature' as campus indus-
trial uses." *Friends of Eugene*, 46 Or LUBA at 733. Because
"campus" industrial uses *include* complementary uses such
as supporting commercial establishments serving primary
industrial uses and because CHOICES raised the issue
whether a hospital is of the same nature as a campus indus-
trial use, CHOICES has preserved the argument that it
raises on review.

As to the merits, the ordinance allows hospitals as
outright permitted uses in all three of the city's industrial
zones. CHOICES asserts, and we do not understand the city
and PeaceHealth to dispute, that the city's industrial zones
roughly correspond to the "campus," "light-medium," and
"heavy" industrial designations in the Metro Plan. LUBA
reasoned, the "heavy industrial and light-medium industrial
guidelines specifically include light (or campus) industrial
uses as well." *Id.* Thus, as did LUBA, we examine the Metro
Plan's guidelines concerning the "campus" industrial desig-
nation, which provide:

"The primary objective of this designation is to provide
opportunities for diversification of the local economy
through siting of light industrial firms in a campus-like set-
ting. The activities of such firms are enclosed within attrac-
tive exteriors and have minimal environmental impacts,
such as noise, pollution and vibration, on other users and on
surrounding areas. Large-scale light industrial uses,
including regional distribution centers and research and
development complexes, are the primary focus of this des-
ignation. Provision should also be made for small- and
medium-scale industrial uses within the context of indus-
trial and business parks which will maintain the campus-
like setting with minimal environmental impacts. Comple-
mentary uses such as corporate office headquarters and

*supporting commercial establishments serving primary uses may also be sited on a limited basis.*"

(Emphasis added.)

Under the Eugene Code, a hospital is a permitted use in certain commercial zones. To be consistent with the Metro Plan, however, a hospital may be allowed in an industrial zone if it is a supporting commercial establishment serving primary industrial uses. The problem with the city's ordinance is that it allows any hospital as a permitted use in industrial zones without any consideration of whether the establishment of the hospital in the zone serves a primary industrial use. As with our conclusion regarding the first assignment of error, it does not appear that there is any mechanism to evaluate whether any proposed hospital and related development is consistent with the provisions of the Metro Plan.[3] That reasoning obviates the need to address the city's and PeaceHealth's arguments concerning LUBA's reliance on a list of nonindustrial uses that are allowed in the city's industrial zones. In sum, LUBA erred in concluding that the ordinance is consistent with the Metro Plan.

Reversed and remanded.

---

[3] We note that LUBA concluded that the city's inclusion of hospitals as permitted uses in industrial zones was permissible because

"[t]he city interpreted the guidelines as permitting hospitals to be established in industrial zones because a hospital development site, including clinics and laboratories, is the kind of 'campus-like setting with minimal environmental impacts' that are envisioned."

*Friends of Eugene*, 46 Or LUBA at 733. LUBA's conclusion, however, is not supported by the express language of the Metro Plan that essentially provides that industrial zones are to be used for industrial uses. Further, as we have already explained, the ordinance is not consistent with the exceptions to that general proposition in the Metro Plan for supporting commercial establishments.