Argued and submitted April 28, 2000, affirmed on petition; reversed and remanded
for reconsideration on cross-petition January 23, 2002

In the Matter of the Compensation of
Gerardo Alanis, Claimant.

Gerardo ALANIS,
*Petitioner - Cross-Respondent,*

*v.*

BARRETT BUSINESS SERVICES,
*Respondent - Cross-Petitioner.*

97-06529; A105513

39 P3d 880

Max Rae argued the cause and filed the briefs for petitioner - cross-respondent.

Travis L. Terrall argued the cause for respondent - cross-petitioner. With him on the brief was Terrall & Terrall.

Before Edmonds, Presiding Judge, and Armstrong and Kistler, Judges.

ARMSTRONG, J.

**ARMSTRONG, J.**

Claimant seeks review of an order of the Workers' Compensation Board determining his rate of temporary partial disability compensation (TPD) to be $49.87 per week and refusing to assess a penalty for employer's failure to pay TPD. Employer cross-petitions, asserting that the Board erred in awarding any TPD benefits. We affirm on the petition and reverse and remand for reconsideration on the cross-petition.

We take our statement of facts from the Board's findings, which we conclude are supported by substantial evidence. Employer is a temporary service provider and first employed claimant as a temporary worker from September through November 1996 to prune trees, at an hourly wage of $8. Claimant worked for employer again in 1997, from May 12 though May 20, this time thinning trees, at a wage of $10 per hour. Claimant injured his knee at work on May 20, and was unable to work until June 10, when his physician released him for modified work. Employer paid claimant benefits for temporary total disability from May 20 through June 19, 1997.

On June 17, 1997, employer notified claimant that it had become aware that claimant had provided false work documentation and that he was terminated. At that same time, employer notified claimant that, but for the termination, employer would have offered claimant modified work approved by his physician, to begin June 20, 1997, at 40 hours per week, for a weekly wage of $325.20, or $8.13 per hour.

As of the date of the hearing, claimant had not been released for regular work and had no earned wages. Claimant asserted before the Board and asserts on review that, because he was unable to work due to his undocumented status and had no wages, his TPD benefits should be based on the full temporary total disability (TTD) rate, which would be $270 per week. Employer asserts in its cross-petition that the wage of the modified job was not lower than claimant's average weekly wage at the time of injury and that, because claimant's wage loss is due to his status as an undocumented

worker rather than due to his disability, his TPD benefits should be zero.

In *Hernandez v. SAIF*, 178 Or App 82, 35 P3d 1099 (2001), we recently held that, under ORS 656.325(5)(c), *former* ORS 656.212(2) (1999) and OAR 436-060-0030(7), a worker who has been released for modified work but who is unable to work because of the worker's undocumented status is not entitled to benefits for TPD at the full TTD rate. However, the worker is entitled to TPD based on the difference between the pre-injury wage and the wage of a physician-approved modified job, whether or not the job is offered and available and irrespective of the inability to work due to the undocumented status. Accordingly, claimant is not entitled to benefits for TPD based on the full TTD rate just because he was unable to work due to his undocumented status; however, he is entitled to benefits for TPD based on the difference, if any, between the pre-injury wage and the wage of the physician-approved modified job.

The remaining question is the calculation of that benefit. That depends first on claimant's average weekly wage at the time of injury. ORS 656.210(1), (2)(b)(A). The parties agree that OAR 436-060-0025 applies for the purpose of determining claimant's average weekly wage at the time of injury, but they disagree about the meaning of the rule. In construing the administrative rule, we apply the same analytical framework applicable to the construction of statutes, *PGE v. Bureau of Labor and Industries*, 317 Or 606, 612 n 4, 859 P2d 1143 (1993), first examining the rule's text in its context. OAR 436-060-0025 provides, in part:

> "(5) The rate of compensation for workers regularly employed, but paid on other than a daily or weekly basis, or employed with unscheduled, irregular or no earnings shall be computed on the wages determined by this rule. * * *
>
> "(a) For workers employed seasonally, on call, paid hourly, paid by piece work or with varying hours, shifts or wages:
>
> "(A) Insurers shall use the worker's *average weekly earnings with the employer at injury for the 52 weeks prior to the date of injury. For workers employed less than 52 weeks or where extended gaps exist, insurers shall use the*

*actual weeks of employment (excluding any extended gaps) with the employer at injury up to the previous 52 weeks.* For workers employed less than four weeks, insurers shall use the intent of the wage earning agreement as confirmed by the employer and the worker. For the purpose of this section, the wage earning agreement may be either oral or in written form.

"(B)(i)   Where there has been a change in the wage earning agreement during the 52 weeks prior to the date of injury due only to a pay increase or decrease, insurers shall use the worker's average weekly hours worked for the 52 week period, or lesser period as required in (5)(a)(A) of this subsection, multiplied by the wage at injury to determine the worker's current average weekly earnings.

"(ii)   Where there has been *a change in the wage earning agreement* during the 52 weeks prior to the date of injury due to a change of hours worked, change of job duties, or for other reasons either with or without a pay increase or decrease, insurers shall average earnings for the weeks worked under the most recent wage earning agreement, *calculated by the method described in (5)(a)(A).*

"(iii)   For workers employed *less than four weeks under a changed wage earning agreement as described in this subsection, insurers shall use the intent of the most recent wage earning agreement* as confirmed by the employer and the worker.

"(b)   Workers employed through a temporary service provider on a 'temporary basis,' * * * shall have their weekly wage determined by the method provided in subsection (a) of this rule. However, *each job assignment shall not be considered a new wage earning agreement.*" (Emphasis added.)

As we read the text of the rule, it works in this way: Subsection (5) applies to the calculation of the wages of workers who fit the criteria of subsection (5), *i.e.,* those who are paid on other than a daily or weekly basis or employed with unscheduled, irregular or no earnings. Subparagraph (5)(a) applies to workers employed seasonally, on call, paid hourly, paid by piece work or with varying hours, shifts or wages. Subparagraph (5)(a)(A) provides the general *method* for calculating the benefits of those workers: insurers must use the worker's average weekly earnings with the employer at injury for the

52 weeks before the date of injury or, if there are extended gaps, insurers must use the actual weeks of employment up to the previous 52 weeks. The separate paragraphs of subparagraph (5)(a)(B) modify that method when there has been a change in the wage earning agreement. Each paragraph describes a different type of change in the wage earning agreement and explains how the calculation of the average weekly wage described in subparagraph (5)(a)(A) is to be adjusted. Paragraph (5)(a)(B)(i) provides that, when the change in the wage earning agreement is due only to a pay increase or decrease, the wage to be multiplied by the average weekly hours worked is the wage at injury. Paragraph (5)(a)(B)(ii) provides that when the change in the wage earning agreement is due to a change in the hours worked, the job duties or other reasons, the insurer shall average earnings only for the weeks under the most recent wage earning agreement. Paragraph (5)(a)(B)(iii) provides that when a worker has been employed fewer than four weeks under a changed wage earning agreement, the average weekly wage shall be determined based on the intent of the most recent wage earning agreement, as confirmed by the employer and the worker.

Subparagraph (5)(b) describes a different category of worker from that described in subparagraph (5)(a): "Workers employed through a temporary service provider on a 'temporary basis.'" It is undisputed that claimant is employed through a temporary service provider on a temporary basis. Subparagraph (5)(b) provides that his average weekly wage is to be determined "by the method provided in subsection (a)," except that "each job assignment shall not be considered a new wage earning agreement." The dispute on review turns on the meaning of that last quoted phrase and on whether claimant's second job assignment should be treated as a new wage earning agreement.

In the Board's view, although the administrative rule provides that *each* new job assignment shall not be treated as a new wage earning agreement, it does not preclude a finding that a *particular* job assignment is a new wage agreement, depending on the facts. In this case, the Board found that claimant's second job assignment, which involved different work and different wages, was a new wage earning agreement. Analyzing the text of the administrative

rule, the Board reasoned that the first sentence of subparagraph (5)(b) provides that a temporary worker's wages are to be calculated under (5)(a), indicating an intention that all of the subparagraphs of subsection (5)(a) apply. Because employer's reading of subsection (5)(b) would eliminate consideration of the factors listed in (5)(a)(B), the Board believed that reading to be contrary to the intentions of the Director of the Department of Consumer and Business Services. It chose an interpretation that, it said, would allow it to give significance to all the provisions of subsection (5)(a).

In our view, the Board's reading is inconsistent with the plain text of the rule and its context. The rule provides that each job assignment *shall not* be considered a new earning wage agreement. The meaning of that language is plain. When the worker is temporary and is working for a temporary service provider, the worker's various job assignments are not to be considered new wage agreements. That much is simple and clear. The Board's reasoning that "each" does not mean "every," and that, although not *all* job assignments shall be treated as new wage agreements, *some* job assignments may be new wage earning agreements, depending on the facts, is strained and implausible. If the Director had intended that a temporary worker's job assignment should be evaluated on its facts to determine whether it is a new wage agreement, the Director could have so provided. Accordingly, we conclude that OAR 436-060-0025(5)(b) precludes treatment of claimant's second job assignment as a new wage agreement and that the provisions of subsection (5)(a)(B) are therefore inapplicable to the calculation of his average weekly wage. We therefore remand the case to the Board for recalculation of TPD pursuant to OAR 436-060-0025(5)(a)(A).

Affirmed on petition; reversed and remanded for reconsideration on cross-petition.