Argued and submitted March 23, affirmed June 22, 2005

KNUTSON FAMILY LLC,
*Petitioner below,*

*v.*

CITY OF EUGENE,
*Respondent below,*

*and*

Carl BOTHMAN,
Chris Bothman
and Carlee Investments, LLC,
*Intervenors - Respondents below.*

Carl BOTHMAN,
Chris Bothman
and Carlee Investments, LLC,
*Petitioners,*

*v.*

CITY OF EUGENE
and Knutson Family LLC,
*Respondents.*

2004-100, 2004-106; A127379

114 P3d 1150

Douglas DuPriest argued the cause for petitioners. On the brief were William H. Sherlock and Hutchinson, Cox, Coons, DuPriest, Orr & Sherlock, P.C.

Bill Kloos argued the cause for respondent Knutson Family LLC. On the brief were Dan Terrell and Law Office of Bill Kloos, PC.

No appearance for respondent City of Eugene.

Before Schuman, Presiding Judge, and Brewer, Chief Judge, and Deits, Judge pro tempore.

BREWER, C. J.

## BREWER, C. J.

Petitioners seek review of an order of the Land Use Board of Appeals (LUBA) that remanded the City of Eugene's denial of an application to rezone five parcels of property that are owned or controlled by Knutson.[1] *Knutson Family LLC v. City of Eugene*, 48 Or LUBA 399 (2005). The critical legal issue underlying the propriety of the city's decision is whether the plan designation of the subject property is Medium Density Residential or Commercial. On review, petitioners contend that LUBA incorrectly determined the relationship between the Metro Plan diagram, which is a graphic depiction of the plan designations for the region, and the Willakenzie Area Plan (WAP), a refinement plan that implements the Metro Plan and includes site-specific land use designations. For the reasons that we will explain, we affirm.

We take the facts from LUBA's order.

"The subject property consists of five parcels totaling approximately 2.92 acres in size, owned or controlled by * * * Knutson. Tax lots 4000, 4100, 4300 and 4400 front on Coburg Road, a north-south arterial, and are zoned Neighborhood Commercial (C-1). Tax lot 4000 is developed with a medical clinic. Tax lots 4100, 4300 and 4400 are vacant. Tax lot 4900 fronts on Willakenzie Road, an east-west street, and is zoned General Office (GO), a commercial zone. Tax lot 4900 is developed with an office building.

---

[1] Petitioners on review are Carl Bothman, Chris Bothman, and Carlee Investments, LLC. The Bothmans were parties before LUBA. *See* OAR 661-010-0010(11) (providing, in part, that a "party" is "the petitioner, the governing body, and any person who intervenes as provided in OAR 661-010-0050"). Evidence in the local record indicates that the Bothman family has operated a small franchise restaurant near the subject properties for many years and that rezoning the subject property as commercial property might affect that business. Thus, we conclude that the Bothmans have statutory and constitutional standing. *See* ORS 197.850(1) (providing that "[a]ny party to a proceeding before the Land Use Board of Appeals under ORS 197.830 to 197.845 may seek judicial review of a final order issued in those proceedings"); *Barton v. City of Lebanon*, 193 Or App 114, 117-18, 88 P3d 323 (2004) (holding that a grocery store owner had constitutional standing to challenge the decisions that facilitated the siting of a Wal-Mart Superstore because his grocery store would compete for business with the Wal-Mart; thus, a decision in the case would have a practical effect on the grocer's interests). Because the Bothmans have standing and they and Carlee Investments make the same arguments on review, we do not need to consider whether Carlee Investments has standing. *Id.* at 118.

"Two properties south and east of the subject parcels, at the intersection of Coburg Road and Willakenzie Road, are zoned Community Commercial (C-2). Carlee owns one of these C-2 zoned properties. Further south across Willakenzie Road are a number of parcels zoned C-1 and C-2. To the east across Coburg Road are a number of properties zoned C-1, C-2 and R-2 (Medium Density Residential) and R-3 (High Density Residential). North of the subject property are three lots zoned GO, and further north a strip of land zoned R-1. A large area west of the subject property is zoned R-2, while an area further to the west is zoned Public Land (PL) and developed with a high school."

*Id.* at 402-03. The following diagram, which appears in LUBA's opinion, illustrates the location of the subject property:[2]

The subject property is also depicted on the Metro Plan diagram, "a map that depicts the plan designations for the Eugene-Springfield Metropolitan Area at a scale of one inch equals 8,000 feet." *Id.* at 404. The diagram

"does not depict property boundaries, and shows only the more significant streets. For example, in the area of the subject property the Metro Plan diagram depicts Coburg Road, but not Willakenzie Road. In the approximate area of the subject property, the diagram shows a half-moon shaped blob of red color, indicating a Commercial plan designation, on the west side of Coburg Road. The red blob extends north from Cal Young Road, a road south of and roughly parallel to Willakenzie Road, to an indeterminate point on Coburg Road. To the west of the red blob is an orange blob indicating a Medium Density Residential plan

---

[2] The diagram does not indicate the scale to which it is drawn.

designation. Further west is a blue blob indicating a Government and Education plan designation. East of Coburg Road the plan diagram depicts another half-moon shaped blob of red color that starts somewhere north of the intersection of Cal Young Road and Coburg Road, and curves north to end at an indeterminate point along Coburg Road."

*Id.*

The parcels are also "within an area that is subject to an acknowledged refinement plan known as the Willakenzie Area Plan (WAP), adopted in 1992." *Id.*

"The WAP includes a property-specific map of plan designations. The WAP plan map depicts the C-1 zoned subject property and the GO-zoned lots north of the subject property along Coburg Road as Commercial. The WAP also includes a large-scale map for the Sheldon Sub-area, which includes the subject property. The Sheldon Sub-area map depicts the subject property and the adjoining GO-zoned parcels with a Commercial plan designation."

*Id.*

Knutson applied to rezone the subject property "to C-2, which allows more intensive commercial uses than the C-1 or GO zones." *Id.* at 405. "[T]he hearings official concluded based on the Metro Plan diagram that the subject property is designated Medium Density Residential and that the proposed C-2 zoning is inconsistent with that plan designation and with applicable Metro Plan and WAP policies, under [Eugene Code (EC)] 9.8865(1) and (2)."[3] *Knutson Family LLC*, 48 Or LUBA at 405. The planning commission affirmed that decision of the hearings official.

LUBA reversed, concluding that the Metro Plan and the WAP designations of the subject property were not inconsistent and that the property is designated Commercial; thus, LUBA invalidated the planning commission's legal basis for denying Knutson's request to rezone the property and rejected the legal methodology that the city used to make

---

[3] EC 9.8865 provides, in part, that, to approve a zone change application, the proposed change must be consistent with the Metro Plan and any applicable refinement plan and that the Metro Plan controls if there is an inconsistency between those plans.

its decision. LUBA explained that, based on the Metro Plan diagram,

> "it is not 'clearly evident' to us, or evident at all, that the subject property lies entirely outside the Commercial blob west of Coburg Road. As noted, the western and northern edges of that Commercial blob have no referents, such as a street or an intersection, that can be used to fix its position with respect to particular property boundaries with even approximate accuracy. The subject parcels might adjoin the Commercial blob, as the planning commission and hearings official concluded, or they might lie partially inside, or even entirely inside, that red blob. Given the small scale of the Metro Plan diagram, and the lack of referents to fix the western and northern edges of the Commercial blob west of Coburg Road to any particular property, we do not see that it is possible, based solely on examination of the Metro Plan diagram, to determine the plan designation of the subject parcels."

*Id.* at 414. Further, LUBA reasoned that, under those circumstances—that is, where the pertinent borders of a "blob" cannot be correlated accurately to any referents or property boundaries and the subject property is located near the border of the blob—"the applicable refinement plan, if any, is used to determine the location of the border between adjoining plan designations with respect to particular properties." *Id.* LUBA then explained that it had reached a similar conclusion in *Carlson v. Eugene*, 3 Or LUBA 175 (1981), in which

> "the location of the border between the Industrial and Residential plan designations in the pertinent refinement plan appeared to vary considerably from that shown on the Metro Plan diagram. Nonetheless, both this Board and the city council concluded that there was no conflict between the two plan diagrams, and that the location of the plan designation boundaries, and hence the plan designation of the subject property, was appropriately determined by the refinement plan. In the present case, the location of the border between the Commercial and Medium Density Residential designations as depicted on the Metro Plan diagram and the WAP diagram appears to differ, if it differs at all, less than the difference in *Carlson*. We conclude, as we did in *Carlson*, that the Metro Plan diagram and the pertinent refinement plan diagram do not conflict. As the Metro Plan

diagram and text indicate, local governments have a certain amount of discretion in adopting refinement plans that refine the Metro Plan diagram, including determining the precise location of plan designations with respect to particular properties. Unless that determination conflicts with the Metro Plan diagram much more clearly than it does here, there is no basis to conclude, as the planning commission and hearings official did, that the refinement plan diagram and Metro Plan diagram conflict."

*Knutson Family LLC*, 48 Or LUBA at 414-15.

In petitioners' first assignment of error on review, they contend that LUBA erred in finding that the subject property is designated Commercial because substantial evidence supports the city's finding that the property is designated Medium Density Residential under the Metro Plan. Specifically, petitioners assert that "LUBA exceeded its authority by conducting a narrow *de novo* review of the factual evidence rather than make a determination whether the city adequately considered the substantial evidence in the whole record" and that LUBA then "compounded its error by effectively making the Metro Plan diagram subservient to the WAP diagram" when it determined that the Metro Plan and the WAP "are consistent in their designation of the subject properties."[4]

Knutson disagrees with petitioners' contention that the subject property's plan designation is a finding of fact that is subject to substantial evidence review by LUBA. Instead, Knutson asserts that a parcel's designation reflects a legal conclusion that is made after consideration of the applicable plans and that

---

[4] In their brief, petitioners assert that

"the WAP text explains that the WAP diagram 'is not a zoning map. In many cases, more than one zoning district would be consistent with the recommended land use pattern.' Thus, the WAP recognizes that it is not only subordinate to the Metro Diagram as a matter of law, but that its diagrams should not be relied on as definitively designating the zoning classification for specific parcels, thereby contravening LUBA's premise of its reliability."

(Record citations omitted.) In this case, however, the issue is not the particular zoning classification of the subject property but rather the subject property's plan designation. We do not understand either party to assert that the Metro Plan diagram and the WAP map cannot be used for resolving that issue.

"[t]he framework for how to determine a parcel's plan designation under the Eugene-Springfield *Metro Plan* is well established. The *Metro Plan* Diagram is a generalized 'blob' diagram, which is made more specific in certain areas by area refinement plans. The text of the *Metro Plan*, the *Metro Plan* Diagram, and area refinement plans explains the relationship among these documents. Those relationships have been further explained through case law over the past twenty years. LUBA correctly followed this prescribed methodology to reach the conclusion that there is no inconsistency between the *Metro Plan* Diagram and the *Willakenzie Area Plan* (*WAP*) Sheldon Subarea diagram and that the subject properties are plan designated Commercial."

Petitioners are correct that, at least in certain circumstances, findings of fact such as the location of a piece property or the color of a "blob" may play a crucial role in determining the property's plan designation. As we have already indicated, however, the critical issues in this case are the relationship between the Metro Plan and the WAP and the methodology for determining the plan designation of the subject property. Contrary to petitioners' assertions, those are not questions of fact but are legal issues that are governed by the plans themselves.

The Metro Plan is a framework plan that is supplemented by more detailed refinement plans. *See Jaqua v. City of Springfield*, 193 Or App 573, 580, 91 P3d 817 (2004) ("LUBA concluded, and we agree, that the Metro Plan operates as a general plan and that it contemplates that it will be supplemented, as the plan states, 'by more detailed refinement plans, programs and policies.' "). A note on the Metro Plan diagram states:

"The Plan diagram is a graphic depiction of: (1) the broad allocation of projected land use needs in the metropolitan area[;] and (2) goals, objectives and policies embodied in the text of the plan. One cannot determine the exact designation of a particular parcel of land without consulting with the appropriate local jurisdiction. Local jurisdictions make more specific interpretations of the general diagram through refinement plans and zoning. The relationship of the diagram to text, goals, objectives and policies, and to the refinement plans and zoning, is explained on page I-5.

Large-scale, detailed maps of the site-specific urban growth boundary are on file with the Lane Council of Governments and the Planning Offices of Springfield, Lane County and Eugene."

Further, the diagram includes a cautionary note indicating that,

"[w]hen making land use decisions in areas covered by adopted refinement plans, users should refer to the appropriate plans, as outlined in the Metropolitan Plan, Appendix B, 'Refinement Plans[,'] or to refinement plans adopted subsequent to June 1987."

In other words, the Metro Plan is not the only planning document that must be considered in determining the designation of a particular site. Instead, the Metro Plan expressly contemplates that refinement plans will be considered as well. In this case, the pertinent acknowledged refinement plan is the WAP, which includes a map that depicts the subject property and designates it as Commercial.[5] Accordingly, LUBA correctly examined both the Metro Plan and the WAP and concluded that, as a matter of law, the subject property was designated Commercial.

In reaching that conclusion, LUBA necessarily rejected the proposition that an inconsistency existed between the subject property's designation in the Metro Plan and its designation in the WAP. Although it is clear that the Metro Plan is the guiding document and takes precedence over a refinement plan where inconsistencies exist, the Metro Plan diagram is only a generalized depiction of land uses. The Metro Plan diagram provides few clear boundaries between land use designations. Although some designations

---

[5] In their brief, petitioners included the WAP map with a transparent overlay that depicts the Metro Plan diagram's designations purportedly enlarged to the same scale as the WAP map. Petitioners rely on that overlay to support their position that, after changing the Metro Plan diagram to an appropriate scale, it is apparent that the land use designation for the property based on the Metro Plan is Medium Density Residential. In its brief, Knutson asks us to strike the overlay from petitioners' excerpt of record because it is not part of the record. However, even if we assume that the overlay is part of the record, it reflects a methodology that is not supported by the Metro Plan diagram, which refers users to the local refinement plans to determine the appropriate land use designation. In other words, petitioners' use of the overlay is an attempt to use the Metro Plan diagram for a purpose for which it was not intended.

appear to border named streets, most do not, and the diagram's comparatively small one inch to 8,000-foot scale does not include any depiction of individual lots. As a consequence, the land use designation for properties near the boundary between use designations on the diagram is unclear. As indicated by the Metro Plan, those ambiguities require reference to local government refinement documents to conclusively determine the applicable designation. Under those circumstances, there is no inconsistency between the Metro Plan and a refinement plan. Instead, the refinement plan serves to resolve the inherent ambiguities that exist in a general diagram such as the Metro Plan diagram.[6]

In petitioners' second assignment of error, they assert that, because LUBA incorrectly determined that the subject property was designated Commercial, LUBA erred in determining that the city's "interpretation of applicable plan policies were either biased or premature." In light of our determination that LUBA did not err in concluding that, as a matter of law, the subject property is designated Commercial, there is no need for us to reach petitioners' second assignment of error.

Affirmed.

---

[6] Under different circumstances, however, an inconsistency between the Metro Plan and a refinement plan could clearly exist. For example, if it were possible to locate a subject property based on the minimal referents in the Metro Plan diagram *and* the location of the property was not near the boundary between two use designations, the Metro Plan diagram, *as a matter of law, might indicate the subject* property's land use designation. In that case, the designation in the Metro Plan diagram would prevail over an inconsistent designation in the applicable refinement plan.